AMALGAMATED TRANSIT UNION,
LOCAL 1564, AFL-CIO v SOUTHEASTERN
MICHIGAN TRANSPORTATION AUTHORITY

Docket No. 85589. Argued October 2, 1990 (Calendar No. 5). Decided
July 15, 1991.

Amalgamated Transit Union, Local 1564, AFL-CIO, filed an un-
fair labor charge with the Michigan Employment Relations
Commission against the Southeastern Michigan Transportation
Authority, alleging that SEMTA had unilaterally altered a term
or condition of employment, specifically, its disciplinary scheme
applicable to probationary employees. The MERC stayed its
proceedings pending arbitration. An arbitrator found that the
new disciplinary scheme applied to probationary employees and
that the union was not prevented from representing the proba-
tioners. The Oakland Circuit Court, Richard D. Kuhn, J.,
vacated the decision of the arbitrator and granted summary
disposition for the defendant, finding that the disciplinary
policy applicable to probationary employees was not subject to
arbitration. The Court of Appeals, RILEY, P.J., and D. E. HOL-
BROOK, JR., and MICHAEL J. KELLY, JJ., affirmed (Docket No.
56672). Thereafter, a hearing referee found that the discipli-
nary policy applied to probationary employees had become a
term or condition of employment which could not be altered
unilaterally and concluded that the union did not waive its
right to bargain over changes in the policy. The MERC affirmed.
The Court of Appeals, SULLIVAN, P.J., and MAHER and P. J.
CLULO, JJ., affirmed in an unpublished opinion per curiam,
holding that SEMTA engaged in an unfair labor practice by
unilaterally altering the disciplinary policy (Docket No.
103428). The defendant appeals.

In an opinion by Justice BOYLE, joined by Chief Justice
CAVANAGH and Justice LEVIN, the Supreme Court *held:*

SEMTA engaged in an unfair labor practice by unilaterally
altering the disciplinary policy it applied to probationary em-
ployees. The unfair labor practice charge was not precluded by
the prior decisions of the circuit court and Court of Appeals
concerning the arbitrability of the parties' contractual dispute.
The MERC's conclusion that the parties' consistent practice with
respect to the discipline of probationary employees gave rise to

a term or condition of employment was supported by competent, material, and substantial evidence on the whole record. The management-rights clause did not amount to a clear and unmistakable waiver of the union's right to negotiate concerning the disciplinary policy applicable to probationary employees.

1. The public employment relations act imposes a duty to negotiate in good faith over mandatory subjects of bargaining during the life of the collective bargaining agreement. While the parties may agree by contract to grant the right to take unilateral action, neither party may take unilateral action on such a subject unless it has satisfied the statutory obligation or has been freed from it. Factual findings of the commission are conclusive if supported by competent, material, and substantial evidence on the whole record, and the agency's choice between two reasonably differing views of the evidence must be given due deference. Legal rulings of an administrative agency may be set aside if they are in violation of the constitution or a statute or are affected by a substantial and material error of law.

2. Collateral estoppel applies to preclude relitigation of issues actually determined by final judgment and essential to a judgment in a prior action between the parties. In order for collateral estoppel to apply, the issue must be identical to that determined in the prior action. Contractual and statutory claims, even when based on the same controversy, generally involve different factual and legal issues. Whether a party has engaged in an unfair labor practice prohibited by the PERA requires inquiries beyond interpretation of a collective bargaining agreement. In this case, the decision regarding the question of arbitrability did not decide the merits of the underlying claim. Because the Court of Appeals did not reach the rationale employed by the circuit court, the circuit court judgment was not conclusive. Thus, collateral estoppel does not bar this action.

3. A past practice which does not derive from the parties' collective bargaining agreement may become a term or condition of employment, binding on the parties. The creation of a term or condition of employment by past practice is premised in part upon mutuality and is justified by the parties' tacit agreement that the practice will continue. The nature of a practice, its duration, and the reasonable expectations of the parties may justify its attaining the status of a term or condition of employment. Whether the parties bargained with regard to the subject or dealt with it in their collective bargaining

agreement is relevant. When a practice is consistent with discretion conferred upon an employer by contract, but is not required by contract, a factual question is presented regarding the existence of the mutuality necessary for a binding past practice. While the existence of a contractual clause granting management discretion to engage in a particular practice may be evidence that the mutuality required for a binding past practice is lacking, it does not preclude the creation of a term or condition of employment. All pertinent evidence, including the specificity of the reservation, the practices of the parties, the policies of the employer, and the bargaining history must be examined to determine whether a term or condition of employment is established. In this case, the MERC's conclusion that the application of the disciplinary procedure to probationary employees had become a term or condition of employment was supported by competent, material, and substantial evidence on the whole record and clearly is a reasonable view of the evidence which should not be displaced.

4. The waiver of statutorily protected rights in a contractual provision should not be inferred; the undertaking must be stated explicitly, and must be clear and unmistakable. Whether a union clearly and unmistakably waives its right to bargain over a specific matter is typically reviewed as a factual finding. In this case, the management-rights clause is not sufficiently specific to demonstrate that the union clearly and unmistakably waived its right to bargain over changes in the disciplinary policies applied to probationary employees. Nor is there any evidence to indicate an actual intent by the union to relinquish its statutory right to negotiate concerning the disciplinary scheme applicable to probationary employees. The commission's findings were supported by competent, substantial, and material evidence.

Affirmed.

Justice BRICKLEY, joined by Justice GRIFFIN, dissenting, stated that an exercise of a practice that is clearly pursuant to, consistent with, and in fulfillment of a term or terms of a collective bargaining agreement does not become a term or condition of employment apart from the collective bargaining agreement that requires midterm bargaining. The parties vested in the employer the sole authority to establish how and under what conditions probationary employees could be discharged. No violation of the duty to bargain exists under these facts because the parties bargained over the terms, and the employer's conduct clearly was consistent with the bargain.

Thus, the decision of the Court of Appeals should be reversed and the case remanded to the MERC.

Justices RILEY and MALLETT took no part in the decision of this case.

*Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, P.C.* (by *Theodore Sachs* and *I. Mark Steckloff*), for the plaintiff.

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *John Corbett O'Meara, Thomas G. Kienbaum,* and *Theodore R. Opperwall*) for the defendant.

BOYLE, J. This action arises under MCL 423.210(1)(e); MSA 17.455(10)(1)(e) of the public employment relations act. Amalgamated Transit Union has charged that the Southeastern Michigan Transit Authority (now the Suburban Mobility Authority for Regional Transportation) committed an unfair labor practice by unilaterally altering a term or condition of employment, specifically the disciplinary scheme applicable to probationary employees. We affirm the decision of the Court of Appeals, which upheld the conclusion of the Michigan Employment Relations Commission that SEMTA did engage in an unfair labor practice by unilaterally altering the disciplinary policy it applied to probationary employees.

I

In 1975, the parties drew up a letter of understanding specifying penalties for an operator's failure to appear for work at the scheduled time and place. This letter was substantially incorporated in the 1977 contract between the parties as article

37, § 1, providing a seven-step "Miss-Outs" procedure.[1]

The 1977 contract also contained the following provision regarding probationary employees:

> All new OPERATORS coming within the scope of this Agreement shall be on probation for a period of ninety (90) calendar days from the date they complete their training requirements. Such probationary period shall constitute a trial period during which the AUTHORITY judges the ability, competency, fitness, and other qualifications of new OPERATORS to do the work for which they were employed. . . .
>
> During such probationary period, the AUTHORITY may discharge the OPERATOR at any time and its right to do so shall not be questioned by the UNION; nor shall the UNION assert or present any grievance on behalf of any such new OPERATOR.

The above provisions of article 6, §§ 1-2, of the 1977 contract were also contained in the 1974-77 contract between the parties; however, the earlier contract provided that both the union and SEMTA were to judge the qualifications and fitness of probationary employees.[2]

---

[1] For each failure to report for duty at the proper time and place, an OPERATOR will be charged with a miss. Discipline for misses will be as follows:

A. First miss—written warning.

B. Second miss—without sixty (60) days free of misses since the last miss—one (1) day violation.

C. Third miss—without sixty (60) days free of misses since the last miss—three (3) days violation.

D. Fourth miss—without sixty (60) days free of misses since the last miss—one (1) day suspension.

E. Fifth miss—without sixty (60) days free of misses since the last miss—three (3) days suspension.

F. Sixth miss—without sixty (60) days free of misses since the last miss—seven (7) days suspension.

G. Seventh miss—without sixty (60) days free of misses since the last miss—dismissal.

[2] Article 5 of the 1974-77 contract provided:

The evidence presented at the hearing in this matter showed that SEMTA generally applied the provisions of article 37, § 1 to probationary employees. In July or August of 1979, SEMTA altered this practice and began applying a new "miss" policy to probationary employees. Union officers met with members of SEMTA management to protest this change. On August 15, 1979, SEMTA posted the new policy whereby probationary employees would be automatically terminated from employment after only four misses.

The union filed the instant unfair labor practice charge on February 12, 1980. Upon a motion by SEMTA, the MERC stayed its proceedings pending the conclusion of the arbitration proceedings.

After considering the terms of the contract as well as the practices of the parties, the arbitrator initially found that article 37, § 1 of the 1977-80 collective bargaining agreement, specifying a seven-step disciplinary scheme for "misses," did apply to probationary employees, and "that [article 6, § 2] does not prevent the Union from questioning disciplinary action, including discharge, by SEMTA of probationary employees for engaging in miss-outs, or the presentation of grievances by the Union on behalf of such operators in such circumstances."

---

All new EMPLOYEES coming within the scope of this Agreement shall be on probation for a period of sixty (60) days from the date they complete their training requirements and report to an assigned station designated by the AUTHORITY, ready for work. Such probationary period shall constitute a trial period during which the AUTHORITY and the UNION are to judge the ability, competency, fitness, and other qualifications of new EMPLOYEES to do the work for which they were employed. During such probationary period, the AUTHORITY may discharge the EMPLOYEE at any time and its right to do so shall not be questioned by the UNION; nor shall the UNION assert or present any grievance on behalf of any such new EMPLOYEE because of any matter or occurrence whatsoever falling within such probationary period.

On appeal, the circuit court again examined the contract, particularly articles 6 and 37, and concluded that the miss policy applicable to probationary employees was not subject to arbitration. The court's analysis turned on the article 6 provision that SEMTA was to judge the "ability, competency, fitness, and other qualifications" of probationary employees. Any contract provision relating to the "ability, competency, fitness, and other qualifications" of probationary employees, the court concluded, was not subject to arbitration.[3] The court found that misses—failure to appear at the scheduled time and place—related to the qualifications of probationary employees. The court thus found that the arbitrator lacked jurisdiction and granted summary disposition in favor of SEMTA.

The Court of Appeals affirmed the decision of the circuit court on somewhat different grounds. Relying on the language of article 6, § 2 and article 10, § 1, the Court of Appeals concluded that the contract dispute was not arbitrable:

Article 6, § 2 of the collective-bargaining agreement between plaintiff and defendant states that the union will not assert or present any grievance on behalf of any probationary employee. Article 10, § 1 of the agreement defines a grievance as any matter involving the interpretation or application of the terms of the agreement and any dispute concerning the suspension or discharge of an employee. Under these articles, defendant is prohib-

---

[3] The court contrasted "vested" rights or interests granted probationers by contract, which it found were plainly intended to be enforceable. The court viewed these as interests which were "an award of compensation," such as free passes to travel on SEMTA buses, or medical benefits. The circuit judge gave effect to article 6, § 1 by distinguishing between "vested" rights of probationers relating to benefits or compensation, and other contract provisions relating to the ability, competence, fitness or other qualifications of probationary employees.

ited from bringing a grievance to arbitration if it
concerns a probationary employee. Because defen-
dant was prohibited from bringing the grievance
to arbitration by a specific clause of the collective-
bargaining agreement, we can say with positive
assurance that the arbitration clause did not cover
this agreement. [116 Mich App 154, 158; 321
NW2d 876 (1982).]

The union did not appeal the Court of Appeals
determination.

With arbitration thus concluded, the MERC pro-
ceedings relating to the union's unfair labor prac-
tice charges resumed. In a decision and recom-
mended order, the hearing referee rejected SEMTA's
argument that the circuit court's order granting
SEMTA summary disposition was res judicata re-
garding the matters raised in the unfair labor
practices charge. The hearing officer reasoned that
since the instant charge alleged statutory issues
and not merely a contract violation, it raised
issues which were not and could not have been
resolved in the arbitration proceedings. She con-
cluded next that the application of the miss policy
contained in article 37 of the parties' collective
bargaining agreement to probationary employees
became a term or condition of employment which
could not be altered unilaterally. The hearing
officer viewed the crux of the dispute as being
whether article 6, § 2 of the collective bargaining
agreement waived the union's right to bargain
over changes in the disciplinary policy applicable
to probationary employees and concluded that the
union did not waive such right.

The Michigan Employment Relations Commis-
sion affirmed the decision of the hearing officer.
1987 MERC Lab Op 721. The MERC agreed that
SEMTA's consistent application of the seven-step
miss procedure set forth in article 37, § 1 had
rendered the procedure a term or condition of

employment for probationary employees. The MERC cast the waiver question as "whether [SEMTA's] practice should be regarded as subservient to Article 6, and the duty to bargain over changes in the practice waived, or whether the existence of the practice served to limit the grant of broad discretion contained in Article 6 to the extent of requiring [SEMTA] to give notice to and bargain with [the union] before changing this policy." *Id.* at 730. The MERC concluded that the latter was the case, emphasizing the stringent standard applied to the waiver of statutory rights. The MERC also rejected SEMTA's argument that the prior circuit court and the Court of Appeals determinations in the arbitration proceedings estopped consideration of the union's charge of unfair labor practices.

The Court of Appeals affirmed the commission's decision, *Amalgamated Transit Union v Southeastern Michigan Transportation Authority,* unpublished opinion per curiam of the Court of Appeals, decided February 10, 1989 (Docket No. 103428). This Court granted leave to appeal in an order issued April 16, 1990. 434 Mich 900 (1990). Appellant has raised three issues for this Court's consideration: 1) whether the doctrine of collateral estoppel precludes the union from asserting the instant unfair labor practice charge, 2) whether the MERC erred when it concluded that the seven-step miss procedure had become a term or condition of employment for probationary employees, and 3) whether the MERC erred in finding that the union did not waive its statutory right to bargain over such term or condition of employment.

II

The PERA imposes a duty to negotiate in good faith over mandatory subjects of bargaining which persists during the life of the collective bargaining

agreement. MCL 423.215; MSA 17.455(15).[4] Thus, while the parties may by contract agree to grant the right to take unilateral action, it is well established that neither party may take unilateral action on such a subject unless it either has satisfied the statutory obligation or has been freed from it. *NLRB v C & C Plywood Corp,* 385 US 421; 87 S Ct 559; 17 L Ed 2d 486 (1967).

Our review of the commission's decision is circumscribed by the statutory mandate that factual findings of the commission are conclusive if supported by competent, material, and substantial evidence on the record considered as a whole. MCL 423.216(e); MSA 17.455(16)(e), Const 1963, art 6, § 28. Review of factual findings of the commission must be undertaken with sensitivity, and due deference must be accorded to administrative expertise. Reviewing courts should not invade the exclusive fact-finding province of administrative agencies by displacing an agency's choice between two reasonably differing views of the evidence. *MERC v Detroit Symphony Orchestra,* 393 Mich 116, 124; 223 NW2d 283 (1974).

Legal rulings of administrative agencies are not given the deference accorded factual findings. Legal rulings of an administrative agency are set aside if they are in violation of the constitution or a statute, or affected by a substantial and material error of law. MCL 24.306(1)(a), (f); MSA 3.560(206)(1)(a), (f). *Southfield Police Officers Ass'n v Southfield,* 433 Mich 168; 445 NW2d 98 (1989).

### III

Thus we turn to the first issue on appeal. SEMTA

---

[4] The statute requires bargaining with respect to "wages, hours, and other terms and conditions of employment." Subjects falling within the scope of this phrase are known as mandatory subjects of bargaining, *Detroit Police Officers Ass'n v Detroit,* 391 Mich 44, 54; 214 NW2d 803 (1974).

argues that the issue now cast as an unfair labor practice in violation of the PERA presents the same factual question that was resolved in the earlier arbitration proceedings.

Collateral estoppel applies to preclude relitigation of issues actually determined by final judgment and essential to the judgment in a prior action between the parties. *Senior Accountants v Detroit,* 399 Mich 449, 459; 249 NW2d 121 (1976). 1 Restatement Judgments, 2d, § 27, p 250. In order for collateral estoppel to apply, the issue must be identical to that determined in the prior action. *NAACP v Detroit Police Officers Ass'n,* 821 F2d 328, 330 (CA 6, 1987).

SEMTA characterizes the dispositive issue determined in the prior action as the finding "that 'misses' for probationary operators related to their 'qualifications' as judged by SEMTA under Article 6, and that *Article 37's seven-step procedure simply did not apply to probationary operators.*" (Emphasis in the original.)

Assuming that the circuit court did in some sense resolve what SEMTA generally refers to as the "Article 37 versus Article 6" issue, it did so as a matter of contractual interpretation. The question of contract interpretation which was decided in arbitration is not identical to the statutory issue in this case.[5] It is true that this action is based upon the same events that underlay the earlier arbitration proceedings, specifically SEMTA's application of a four-step disciplinary procedure to probationary employees beginning in July or August, 1979. But as this Court recognized in *Bay City Schools v Bay City Ed Ass'n,* 425 Mich 426,

---

[5] The MERC expressly noted that the applicability or nonapplicability of article 37 was not at issue. 1987 MERC Lab Op at 729, n 1.

430; 390 NW2d 159 (1986), contractual and statutory claims, even when based on the same controversy, generally involve different factual and legal issues.[6]

The determination whether SEMTA engaged in an unfair labor practice prohibited by the PERA requires inquiries beyond interpretation of articles 6 and 37 of the collective bargaining agreement. The hearing officer and the MERC were required to determine whether the application of the seven-step miss procedure to probationary employees had become a term or condition of employment by virtue of its consistent application to probationary employees.[7] A determination that article 37 of the collective bargaining agreement did not apply to probationary employees would not settle the question whether the application of the seven-step miss procedure had become a term or condition of employment which, pursuant to the PERA, could not be unilaterally altered absent impasse or waiver. In connection with the unfair labor practice charge upon which this case is based, the hearing officer and the MERC both considered whether article 6 constituted a waiver of the union's statutory right to negotiate over changes in disciplinary policy. Because this question must be answered by application of the stringent standard

[6] The strict holding in *Bay City Schools* was that the pendency of unfair labor practices in the Michigan Employment Relations Commission does not preclude arbitration of a contract claim arising from the same controversy. Because of the procedural stance of that case, the Court was not faced with the dilemma which might occur if the factual findings in arbitration conflicted with those made in an unfair labor practice case on the basis of the same incidents. Nor are we faced with that dilemma here, where the circuit court and Court of Appeals decisions were limited to the arbitrability of the asserted grievance, see pp 452-454.

[7] SEMTA does not dispute that discipline in general is a mandatory subject of bargaining. Rules governing attendance and setting forth disciplinary policies constitute a mandatory subject of bargaining, *Pontiac Police Officers Ass'n v Pontiac (After Remand)*, 397 Mich 674, 681; 246 NW2d 831 (1976).

for waiver of statutory rights,[8] the issue is not the same as that settled in the prior action.

We disagree with SEMTA's contention that the applicability of article 37 to probationary employees was a necessary predicate for the circuit court or the Court of Appeals determinations. By deciding that the union could not bring a grievance on behalf of probationary employees, the courts did not, and were not required to, determine whether article 37 applied to such employees. A decision on the question of arbitrability does not decide the merits of the underlying claim. *AT&T Technologies, Inc v Communications Workers of America,* 475 US 643; 106 S Ct 1415; 89 L Ed 2d 648 (1986).

Finally, assuming that the circuit court actually decided that article 37 was applicable to probationary employees, we conclude that the circuit court's decision was not a final judgment for purposes of collateral estoppel. The Court of Appeals, affirming the circuit court's summary disposition, decided only that article 6, § 2 precluded the union from asserting any grievance on behalf of probationary employees. Because the rationale used by the circuit court was never reached by the Court of Appeals, the circuit court's judgment is not given conclusive effect:

A judgment affirmed on appeal has conclusive effect, but if the appellate court affirms on grounds that differ from those relied upon by the lower court, the conclusiveness of the judgment as res judicata and as collateral estoppel are governed by the appellate decision. Thus if the trial court rests its judgment on two grounds, each of which is independently adequate to support it, the judgment is conclusive as to both; but i[f] the appellate court affirms on one ground without passing on the other, the second ground is no longer conclu-

---

[8] See pp 460-465.

sively established under the collateral estoppel doctrine. [1B Moore, Federal Practice, ¶ 0.416(2), p 518.]

Having concluded that collateral estoppel does not bar the instant action, we turn to the merits of the appeal.

IV

The next question is whether SEMTA's application of the seven-step miss procedure to probationary employees became a term or condition of employment so that it could not be unilaterally altered absent impasse or waiver.[9] A past practice which does not derive from the parties' collective bargaining agreement may become a term or condition of employment which is binding on the parties.[10] The creation of a term or condition of employment by past practice is premised in part upon mutuality; the binding nature of such a practice is justified by the parties' tacit agreement

[9] In *Pontiac Police Ass'n*, n 7 *supra* at 677, this Court decided that disciplinary procedures fall within the scope of " 'other terms and conditions of employment' " and are a mandatory subject of bargaining.

[10] See *Mid-Michigan Ed Ass'n v St Charles Community Schools*, 150 Mich App 763, 768; 389 NW2d 482 (1986) (the practice of allowing teachers with employed spouses to coördinate health care benefits became a term or condition of employment although not required by contract [for further discussion see n 14]); *Plymouth Fire Fighters Ass'n v Plymouth*, 156 Mich App 220; 401 NW2d 281 (1986) (the city's practice of using fire fighters for "first response" ambulance work, an area not covered by contract, was a term or condition of employment); *Westland v Westland Firefighters Ass'n*, 1988 MERC Lab Op 853 (the practice of paying mileage to overtime employees required to travel to different locations for the rest of the shift, a matter not covered by the contract, was a term or condition of employment; the practice of basing overtime pay for union business on time reported by a union officer also became a term or condition of employment by virtue of past practice); *Mid-Michigan Ed Ass'n v Lake Fenton Community Schools*, 1988 MERC Lab Op 178 (the employers' past practice of providing long-term disability benefits not subject to offset, although not required by contract, had become a term or condition of employment).

that the practice would continue.[11] The nature of a practice, its duration, and the reasonable expectations of the parties may justify its attaining the status of a "term or condition of employment."[12]

The inquiry whether a past practice has given rise to a term or condition of employment is not limited to the consideration of the consistency and duration of the practice itself. Whether the parties have bargained regarding the subject or dealt with it in their collective bargaining agreement are also relevant considerations. In finding that there was substantial evidence in support of a board finding that a Christmas bonus had become a term or condition of employment, the United States Circuit Court of Appeals for the First District in *Isla Verde Hotel Corp v NLRB*, 702 F2d 268 (CA 1, 1983), considered not only the past practice of paying bonuses, but also the bargaining relationship of the parties which had included discussions about bonus payments. *Id.* at 271. In *Office & Professional Employees Int'l Union v NLRB*, 136 US App DC 12; 419 F2d 314 (1969), the court considered "past practice" not only in terms of the consistent use of unit employees to perform audits, but also took note that the union had bargained on the matter in the past, and that discussions had resulted in no contractual provision on the subject. *Id.* at 19.[13]

---

[11] This principle is explicitly stated in two recent decisions of the commission: "To be binding, a past practice must rest on the tacit consent of both parties to the continuation of the practice." *AFSCME v Detroit Transportation Dep't,* 1989 MERC Lab Op 30, 35; see also *Battle Creek Fire Dep't v Organization of Supervisory Personnel,* 1989 MERC Lab Op 726, 735-736.

[12] For example, in *NLRB v Nello Pistoresi & Son, Inc,* 500 F2d 399, 400 (CA 9, 1974), the court, considering whether Christmas bonuses were protected terms or conditions of employment, stated that bonuses "are considered wages if they are of such a fixed nature and have been paid over a sufficient length of time to have become a reasonable expectation of the employees and, therefore, part of their anticipated remuneration."

[13] We have located a lone federal circuit case taking the position

SEMTA argues in the instant case that the requisite element of agreement that the practice of applying the terms of article 37 to probationary employees would continue was not present because SEMTA used article 37 merely as a "guide" for probationary employees, consistent with its discretionary rights under article 6.[14] Thus, SEMTA argues, the seven-step procedure did not become a term or condition of employment because SEMTA, pursuant to article 6, § 1, retained discretion to discharge probationary employees. When a prac-

that "[i]n the face of . . . established practice, the contract is only relevant to the extent that it may indicate the union's waiver of its right to bargain." *Road Sprinkler Fitters Local Union v NLRB,* 219 US App DC 228, 233; 676 F2d 826 (1982). Curiously, the court cited *Office & Professional Employees Int'l Union, supra,* where the court considered not only the bargaining history but the absence of a contractual provision regarding audits or auditors before concluding that the consistent use of unit employees to perform audits had become a term or condition of employment, *id.* at 19. The two other cases cited in *Road Sprinkler Fitters* for the statement that the contract is only relevant to the issue of waiver, *Rose Arbor Manor v Retail Clerks Union,* 242 NLRB 795 (1979), and *NLRB v Sweet Lumber Co,* 515 F2d 785 (CA 10, 1975), cert den 423 US 986 (1975), do analyze management-rights clauses within the analytical framework of waiver. However, they do not limit the relevance of the contract to that question, nor is such a limitation required or suggested by the analyses.

14 SEMTA would thus distinguish this case from *St Charles, supra,* which it apparently accepts as standing for the proposition that a practice which is contrary to a contractual term may give rise to a term or condition of employment. However, as the MERC pointed out on the remand initially ordered in *St Charles,* the practice of providing coördinated benefits to married teachers was not contrary to contractual provision; rather, the contract did not require such benefits but did not forbid them either. The MERC thus treated the situation as presenting the question whether a term or condition had arisen with regard to a practice not covered by the contract. 1985 MERC Lab Op 721, 723. In the Court of Appeals, the panel's characterization of the practice as contrary to contract appeared to relate to the Court's reasoning that the employer, having instituted such practice, could not rely on the contract to unilaterally alter the practice. Thus, the result was in the nature of a waiver of the waiver defense. 150 Mich App 769. We are not faced today with a practice that is "contrary" to contract, and we do not pass on the correctness of the rule, for which *St Charles* has been cited, that a practice contrary to contract may establish a term or condition of employment.

tice is consistent with discretion conferred upon an employer by contract, but is not required by contract, a factual question is presented regarding the existence of the mutuality necessary for a binding past practice. While the existence of a management-rights clause would be evidence that the mutuality upon which a "past practice" term or condition of employment must be based is not present, it is not determinative of the question.

Thus, in *NLRB v Merill & Ring, Inc,* 731 F2d 605, 608 (CA 9, 1984), the court concluded that a "uniform past practice and policy" that employees summoned for jury service were not required to report for work in the morning before jury duty had become a term or condition of employment, notwithstanding the employer's claim that this practice was affirmatively permitted by a clause in the contract.

Similarly, in *Trenton v Trenton Fire Fighters,* 166 Mich App 285, 289-290, 295; 420 NW2d 188 (1988), the Court of Appeals upheld the MERC's conclusion that the fire department's "long-standing policy" regarding minimum manpower requirements established a term or condition of employment, notwithstanding the arbitrator's conclusion in prior proceedings that the contract management-rights clause reserving the employer's right to control "operations" permitted a change in manpower requirements.

The relevance of a contractual provision or other policy of employer discretion to the question whether a term or condition of employment has arisen from past practice was recognized in *Battle Creek Fire Dep't v Organization of Supervisory Personnel,* 1989 MERC Lab Op 726, where the union charged that the city committed an unfair labor practice when it unilaterally began assigning overtime work previously performed by battalion

chiefs to persons outside the bargaining unit. The commission found no evidence of "the mutuality necessary for a binding past practice," noting specifically that the contract had been changed to remove the requirement that overtime be assigned to battalion chiefs, instead making the practice permissive. *Id.* at 736.

Similarly in *AFSCME v Detroit Transportation Dep't,* 1989 MERC Lab Op 30, the MERC declined to find a past practice constituting a term or condition of employment where, pursuant to express written policy, the employer retained the option to deviate from the alleged "past practice."[15]

The approaches of the federal courts, of the Michigan Court of Appeals, and of the commission reveal that the existence of a term or condition of employment is a factual matter. While the existence of a contractual clause granting management discretion to engage in a particular practice

---

[15] In *Detroit Transportation Dep't,* the union charged that the transportation department had committed an unfair labor practice by unilaterally altering the "triggers" for various levels of discipline. The City of Detroit had a written policy specifying "triggers," defined by the number of hours a DOT operator had been absent in a one-year period, which would dictate what level of the six-step disciplinary procedure would be applied to a particular employee. Pursuant to the written policy, the "triggers" were to be set by reference to the average absences of the city's DOT employees in the previous year. Thus, for example, step 3 discipline would be "triggered" by fifty percent of average absences; step 4 discipline would be "triggered" by one hundred percent of average absences. *Id.* at 32. Despite its express reservation of the right to adjust the "triggers" each year on the basis of actual absences, DOT did not do so for seven years. Relying on *St Charles, supra,* the union contended that the city's "past practice" of failing to readjust the "triggers" created a term or condition of employment which could not be unilaterally altered. *Id.* at 33. The commission rejected this theory. First, the commission distinguished *St Charles,* noting that there was no conflict between the failure to readjust and the language of the policy, which allowed, but did not require, readjustment. The commission opined that merely refraining from action does not establish a "past practice" precluding future action, and found no evidence that the city had consented to the elimination of its express option contained in the written policy to readjust the "triggers" for disciplinary action. *Id.* at 35.

may be evidence that the mutuality required for a binding "past practice" is lacking, *Battle Creek, supra,* it does not preclude the creation of a "term or condition of employment." The courts must examine all pertinent evidence, including the specificity of the reservation, the practices of the parties, the policies of the employer, and the bargaining history to determine whether a term or condition of employment is established.

In this case, the existence of a contractual clause reserving SEMTA's right to judge the "ability, competency, fitness, and other qualifications" of probationary employees and to discharge at any time provides some evidence against the conclusion that a term or condition of employment was created. However, the evidence is not so strong as it was in *Detroit Transportation Dep't,* for example, where the written policy specifically permitted the annual readjustment of the disciplinary "triggers." The evidentiary weight of the management-rights clause is counterbalanced by the highly consistent manner in which the seven-step disciplinary procedure was applied to probationary employees.

A review of the exhibits admitted before the hearing officer reveals that at least ninety percent of probationary employees disciplined before August, 1979, were disciplined consistent with the seven-step procedure in article 37. Significantly, most of the violation records make express reference to article 37. At the hearing, two SEMTA operators testified that in their initial training, which immediately preceded the probationary period, they received literature summarizing the seven-step miss procedure. The union introduced as an exhibit a booklet which had been compiled for distribution to probationary employees. That

booklet contained a page headed "Article 37 Miss-Outs" and stated the provisions of article 37.

We find the MERC's conclusion that the application of the provisions of article 37 to probationary employees had become a term or condition of employment to be supported by competent, material, and substantial evidence on the record. The commission's view that the application of the seven-step procedure to probationary employees became a term or condition of employment is clearly a reasonable view of the evidence, and one which should not be displaced by this Court.

V

Thus we turn to the final issue raised by SEMTA and conclude that the commission's finding that the union did not waive its right to bargain over the disciplinary policy applied to probationary employees was not erroneous and was supported by competent, material, and substantial evidence on the whole record.

The waiver of statutorily protected rights in a contractual provision should not be inferred unless the undertaking is "explicitly stated"; such a waiver must be "clear and unmistakable." *Metropolitan Edison Co v NLRB,* 460 US 693, 708; 103 S Ct 1467; 75 L Ed 2d 387 (1983). In applying this standard, the NLRB has looked for evidence of an actual intent to waive a bargaining right:

> In order for contract language to effect a waiver of bargaining rights, it must be "clear and unmistakable." In assessing that question, the Board considers the bargaining history of the contract language and the parties' interpretation of the language. Where an employer relies on contract language as a purported waiver to establish its right to change terms and conditions of employ-

ment not contained in the contract unilaterally, the Board requires evidence that the matter in issue was "fully discussed and consciously explored during negotiations and the union must have consciously yielded or clearly and unmistakably waived its interest in the matter." [1 Morris, Developing Labor Law (2d ed, 5th supp), ch 13, pp 332-333.]

The "clear and unmistakable" standard is applied by the MERC, as well as our Court of Appeals. See *Lansing Fire Fighters v Lansing,* 133 Mich App 56; 349 NW2d 253 (1984); *Kent Co Ed Ass'n v Cedar Springs,* 157 Mich App 59, 66; 403 NW2d 494 (1987); *Westland Fire Fighters Ass'n v Westland,* 1987 MERC Lab Op 793, 801; *Royal Oak Police Officers Ass'n v Royal Oak,* 1988 MERC Lab Op 605, 611. The MERC frequently looks for an "explicit" waiver as well. See *Roseville Fire Fighters Ass'n v Roseville,* 1982 MERC Lab Op 1377, 1386 (clear and explicit waiver is required, absent past practice or other evidence of explicit intent to waive a bargaining right); *Teamsters Union v Mt Clemens,* 1986 MERC Lab Op 30, 33.

The MERC's conclusions regarding whether the union clearly and unmistakably waived its right to bargain over a specific matter is typically reviewed as a factual finding. See *Kent Co Ed Ass'n, supra* at 66; *Mid-Michigan Ed Ass'n v St Charles,* 150 Mich App 763, 771; 389 NW2d 482 (1986) (a management-rights clause was not a sufficiently clear and explicit waiver when viewed in the context of the parties' past practice). See also *Int'l Union v NLRB,* 802 F2d 969, 973 (CA 7, 1986). We cannot dispute the commission's finding that the management-rights clause did not represent a clear and unmistakable waiver of the duty to bargain before altering the disciplinary procedure applicable to probationary employees.

We consider first the language of article 6, § 1 providing that SEMTA "judges the ability, competency, fitness, and other qualifications of new operators to do the work for which they were employed." This wording is not so unequivocal as to justify this Court's overturning the commission's conclusion that the union did not clearly and unmistakably waive the right to bargain over changes in disciplinary policy with respect to probationers. The MERC, as well as the NLRB, typically look for a waiver of the duty to bargain about a specific subject.

The degree of specificity which will indicate an intent to waive a statutory bargaining right is illustrated in *NLRB v United Technologies Corp,* 884 F2d 1569, 1574 (CA 2, 1989), where the court considered whether a contractual management-rights clause constituted a waiver of the union's right to bargain concerning a change in the company's progressive discipline policy. The contractual clause reserved management's right " 'to make and apply rules and regulations for production, discipline, efficiency, and safety.' " On the basis of this language and additional contractual language specifically granting the employer the right " 'to discharge or otherwise discipline any employee for just cause,' " the court found a waiver of union's right to negotiate over disciplinary policy.

By contrast, the NLRB in *Dearborn Country Club & Hotel Employees,* 298 NLRB —; 134 LRRM 1211 (1990), found that the language of a management-rights clause was not sufficiently specific to constitute a waiver of the union's right to bargain over changes in an established practice of offering overtime first to full-time employees. The board found the contractual clause reserving the employer's right "to arrange its work schedules, to designate

days off, and to fix hours worked by employees," "lacking in specific authorizations to make the change in question." The board distinguished the clause held to constitute a waiver in *United Technologies, supra,* noting its specific reference "to the creation and application of rules and regulations for discipline."

In *Spring Lake Ed Ass'n v Spring Lake Schools,* 1988 MERC Lab Op 362, the commission found no waiver of the union's right to bargain over a change in the content of the form used to evaluate teachers, despite a contractual clause reserving management's right to hire teachers and to "'determine their qualifications and the conditions for their continued employment . . . .'" The MERC noted the absence of explicit reference to the evaluation instrument. The MERC also reviewed the parties' bargaining history, which did not reveal an intent by the union to waive its right to bargain over the evaluation form. *Id.* at 366.

The contract in this case is lacking the specificity which would indicate that the union "consciously yielded" its right to negotiate concerning the discipline applied to probationary employees.[16] Article 6, § 1 of the agreement contains no mention of the employer's right to discipline probationary employees. While the right to discipline, not referenced in the contract, is certainly closely related to the employer's judgment of ability, competency, fitness, and "other qualifications," which right is contractually reserved, it is not the same matter. We conclude that the management-rights clause contained in article 6, § 1 of the contract

---

[16] However, to the extent that the Court of Appeals would require express reference to the "duty to bargain," "unfair labor practices," or the use of the word "waiver" in order to effect a valid waiver of the statutory bargaining right, it is in error. Clear and unmistakable is a high standard, but it does not require the use of key words to waive the statutory bargaining right.

between the parties is not sufficiently specific to demonstrate that the union clearly and unmistakably waived its right to bargain over changes in the disciplinary policies applied to probationary employees.[17]

SEMTA also relies on the "sweepingly broad" language of article 6, § 2 which provided that SEMTA could discharge a probationary employee "at any time and its right to do so shall not be questioned by the union; nor shall the union assert or present any grievance on behalf of any such new operator." We accept the commission's conclusion that this language did not clearly and explicitly waive the union's right to bargain over changes in the disciplinary policy applied to probationary employees. Article 6, § 2 refers to discharge, but not to discipline. Nor has SEMTA cited any evidence which would indicate an actual intent by the union to relinquish the statutory right to negotiate concerning the disciplinary scheme applicable to probationary employees.

SEMTA contends that article 6, § 2's broad language providing that the union will not "question" the discharge of probationary employees would be rendered meaningless if interpreted only as a waiver of the right to grieve since article 6, § 2 expressly provides that the union shall not "assert or present any grievance" on behalf of probationary operators.[18] However, the record supports the

---

[17] *Hollins v Kaiser Foundation Hosps,* 727 F2d 823 (CA 9, 1984), cited by SEMTA as containing contract provisions "virtually identical" to those at issue here, is distinguishable in one crucial regard. *Hollins* was a breach of contract action, not a statutorily based unfair labor practice claim. The stringent "clear and unmistakable" standard for waiver, thus, was not applicable in that case.

[18] During such probationary period, the AUTHORITY may discharge the OPERATOR at any time and its right to do so shall not be questioned by the UNION; nor shall the UNION assert or present any grievance on behalf of any such new OPERATOR.

union's contention that article 6, § 2 contemplated only the waiver of the union's right to grieve on behalf of probationers.

In 1980, the ambiguous language of article 6, § 2 was changed to provide that a probationary operator "may be discharged by the Authority without such discharge being subject to grievance."[19] Union representative Phillip Don Leo testified that Daniel Morrill, SEMTA Director of Operations, indicated that this change only clarified what was intended in the 1977-80 contract. That intent, Leo stated, was that the union was able to file grievances for probationary employees relating to actions short of discharge, but not including discharge. According to Leo, the 1980 negotiations involved no discussion about the union's right to go to the MERC or any other agency on behalf of probationary employees, focusing solely on grievance matters.

In view of this testimony, it appears unlikely that the language of the 1977 contract was intended to waive the union's statutory right to negotiate concerning the discipline imposed on probationary employees. We conclude that the commission's findings were supported by competent, substantial, and material evidence.

### CONCLUSION

The MERC and the Court of Appeals correctly

[19] The 1980-83 version of article 6, § 2 was read into the record in its entirety at the hearing before the hearing referee:

"During such probationary period, the operator may be represented by the Union in matters regarding wages and hours. However, during such period, the operator may be discharged by the Authority without such discharge being subject to a grievance. The Authority agrees to provide the Union with a written statement setting forth the reasons for discharge."

found that the instant unfair labor practice charge was not precluded by the prior decisions of the circuit court and Court of Appeals concerning the arbitrability of the parties' contractual dispute. We affirm the commission's finding that the parties' consistent practice with respect to the discipline of probationary employees gave rise to a term or condition of employment, as supported by competent, material, and substantial evidence on the whole record. We also affirm the commission's finding that the management-rights clauses contained in articles 6, § 1 and 6, § 2 did not constitute a "clear and unmistakable" waiver of the union's right to negotiate concerning the disciplinary policy applicable to probationary employees.

The decision of the Court of Appeals is affirmed.

CAVANAGH, C.J., and LEVIN, J., concurred with BOYLE, J.

BRICKLEY, J. (*dissenting*). I agree with the majority that collateral estoppel (issue preclusion) does not foreclose this appeal. However, because I believe that the litigation below did not adequately resolve the question whether the employer's conduct created through practice a term of employment unamenable to unilateral change, I respectfully dissent.

Labor law has long prohibited an employer from unilaterally changing a term or condition of employment embracing a mandatory subject of bargaining. *NLRB v Katz,* 369 US 736; 82 S Ct 230; 8 L Ed 2d 230 (1962). A unilateral change by an employer violates the duty to bargain and thus contravenes "[o]ne of the primary purposes of the Act [designed to] promote the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of

negotiation [in awareness that] refusals to confer and negotiate had been one of the most prolific causes of industrial strife." *Fibreboard Paper Products Corp v NLRB,* 379 US 203, 211; 85 S Ct 398; 13 L Ed 2d 233 (1964).

In the instant case, however, the employer did not violate the duty to bargain over a term or condition. The union and the employer did in fact bargain to vest an unconditional right of the employer to discharge probationary employees.[1] The employer's exercise of discretion in establishing an orderly and fair disciplinary procedure for probationary employees short of discharge did not comprise a unilateral change of a material term or condition under the facts presented. Rather, it constituted an exercise of an agreed-upon provision of the collective bargaining agreement.

Unilateral change of term or condition cases generally appear in two factual configurations. In the first configuration, the contract/collective bargaining agreement is silent or ambiguous with respect to the alleged term or condition created by a past practice. However, the fact that the contract does not explicitly allow a term or condition is of no practical import, since "[the] statutory duty to bargain is independent of any obligation the employer may incur under [the] contract." *Road Sprinkler Fitters Local Union v NLRB,* 219

---

[1] Article 6, §§ 1-2, of the contract provided:

> All new OPERATORS coming within the scope of this Agreement shall be on probation for a period of ninety (90) calendar days from the date they complete their training requirements. Such probationary period shall constitute a trial period during which the AUTHORITY judges the ability, competency, fitness, and other qualifications of new OPERATORS to do the work for which they were employed. . . .
> During such probationary period, the AUTHORITY may discharge the OPERATOR at any time and its right to do so shall not be questioned by the UNION; nor shall the UNION assert or present any grievance on behalf of any such new OPERATOR.

US App DC 228, 233; 676 F2d 826 (1982). Thus, for example, an employer that consistently provides Christmas bonuses to employees, and then rescinds those bonuses without bargaining may commit an unfair labor practice. *NLRB v Nello Pistoresi & Son, Inc,* 500 F2d 399 (CA 9, 1974).

In the second configuration, the contract may explicitly allow or prohibit a particular practice. Even so, courts have found that a consistent policy or practice contrary to the contractual provision may yet ripen into a term or condition which if unilaterally changed initiates an unfair labor practice violation. Thus, in *Mid-Michigan Ed Ass'n v St Charles Community Schools,* 150 Mich App 763, 767, 769; 389 NW2d 482 (1986), the Court of Appeals held that "the [employer's] past practice of providing health care benefits, although contrary to the contract provision, constituted a term of employment which could not be unilaterally changed." The Court reasoned that "[b]ecause the district instituted the practice and permitted it to continue, knowing that it was contrary to the contract, the district cannot now rely on the contractual language to unilaterally change the practice."

The Employment Relations Commission relied on *St Charles* in concluding that in the instant case "[w]hile the broad language of Article 6 gave [the employer] discretion to discharge probationary employees, it did not give [the employer] the explicit right to change a disciplinary policy which constituted an established term or condition of employment without giving [the union] notice and an opportunity to demand bargaining." 1987 MERC Lab Op 721, 730. This statement, of course, begs the question. The obvious answer is that the language of article 6 did give the employer the discretion to discharge probationary employees,

and the appropriate question is having been given that discretion in very clear and unmistakable language, is the rule relating to unilateral change of a term or condition applicable?

The instant case is distinguishable both from cases in which the contract does not refer to the alleged term or condition created by past practice and cases in which a contractual provision conflicts with an established term or condition. Here, the parties bargained, and the resulting bargain provided the employer unfettered discretion to establish any policy to discharge probationary employees during the probationary period, or no policy at all. In exercise of that discretion, the employer chose to utilize the seven-step procedure of article 37 for failure to report for duty, and apparently did so in a fairly consistent manner. However, under the analysis of the MERC, as adopted by the majority, an employer confronts a Hobson's choice. Either an employer could establish no policy regarding discharge, and discharge probationers for the first infraction, or the employer could strive for perfect inconsistency in meting discipline to probationers. Only these courses would avoid the establishment of a uniform past practice and prevent an obligation to bargain over what had previously been bargained.

Under the analysis of the MERC and the majority, an employer that bargains for and obtains discretion to act independently relinquishes that discretion the moment it exercises discretion in a consistent fashion. If the employer exercises bargained-for discretion in an arbitrary and inconsistent manner, the creation of a term or condition through practice does not arise. In the instant case, the employer did not act contrary to the collective bargaining agreement, but in accordance with its terms. Under these circumstances, it can-

not be said that the employer's conduct created a
term or condition of employment. Such an analysis
frustrates the preëminent goal of fostering peace-
ful and orderly collective bargaining.

The majority states that "while the parties may
by contract agree to grant the right to take unilat-
eral action, it is well established that neither
party may take unilateral action on such a subject
unless it either has satisfied the statutory obliga-
tion or has been freed from it." *Ante,* p 450, citing
*NLRB v C & C Plywood Corp,* 385 US 421; 87 S Ct
559; 17 L Ed 2d 486 (1967). If that were a correct
reading of the *Plywood* Court, it would be the end
of the matter. I read the case differently, however,
and, in fact, believe that it supports the opposite
conclusion.

In *Plywood,* a classified wage scale had been
agreed upon in the contract, and management had
reserved the right to give premium pay to some
employees. It subsequently attempted to give such
premium pay to a class of employees, and the
union brought an unfair labor practice petition. In
granting the petition, the NLRB ruled that "the
union had not ceded power to the employer unilat-
erally to change the wage system as it had." *Id.* at
425. The Supreme Court said, "In refusing to
enforce the Board's order, the Court of Appeals *did
not decide that the premium pay provision of the
labor agreement had been misinterpreted by the
Board.*" *Id.* (Emphasis added.) Because the United
States Supreme Court accepted the factual finding
of the meaning of the contract, it reversed the
decision of the United States Court of Appeals and
reinstated the decision of the NLRB. In doing so,
the United States Supreme Court further stated,

> But in this case the Board has not construed a
> labor agreement to determine the extent of the

contractual rights which were given the union by the employer. It has not imposed its own view of what the terms and conditions of the labor agreement should be. . . . The Board's interpretation *went only so far as was necessary to determine that the union did not agree to give up these statutory safeguards.* Thus, the Board, in necessarily construing a labor agreement to decide this unfair labor practice case, has not exceeded the jurisdiction laid out for it by Congress. [*Id.* at 428. Emphasis added.]

It seems to be implicit in this NLRB case before the Supreme Court that if the contract had specifically given the employer the discretion to give this premium pay in the manner in which it did, it would not have had to bargain before instituting the premium pay. The Supreme Court seemed to think that that was the controlling factor. *Plywood* clearly suggests that the MERC should have made a determination of whether or not the employer was changing its seven-step procedure to a four-step procedure pursuant to the contract. The hearing referee's conclusion, affirmed by the MERC, about the meaning of article 6 is as follows:

In my view, the contract language here simply removed Respondent's obligation to demonstrate, with respect to discharged probationary employees, that the discharges were fair and in accord with established policies. [1987 MERC Lab Op 737.]

The specific language of article 6 by any fair and objective reading does not permit such a watering down of its obvious intent.

The parties in this case vested in the employer the sole authority to establish how and under what conditions probationary employees could be discharged. No violation of the duty to bargain

exists under these facts because the parties bargained over the terms, and the employer's conduct clearly is consistent with the bargain. Even under the mutuality analysis applied by the majority, it cannot be said that the employer's conduct created a reasonable expectation that the probationers were entitled to the seven-step procedure for failure to report for duty.

The rule requiring compulsory bargaining over terms created by past practice is designed to foster collective bargaining and ought not be distorted to obliterate a term of a contract that results from the process of collective bargaining. Such a result places the cart before the horse, or, better stated, allows the end to serve the means. For these reasons, I respectfully dissent.

I would hold that an exercise of a practice that is clearly pursuant to, consistent with, and in fulfillment of a term or terms of a collective bargaining agreement does not become a term or condition of employment apart from the collective bargaining agreement that requires midterm bargaining.

I would reverse the decision of the Court of Appeals and remand the case to the MERC for the application of this standard to the case at hand.

GRIFFIN, J., concurred with BRICKLEY, J.

RILEY and MALLETT, JJ., took no part in the decision of this case.