PORT HURON EDUCATION ASSOCIATION v
PORT HURON AREA SCHOOL DISTRICT

Docket No. 96753. Argued January 10, 1996 (Calendar No. 10). Decided
July 16, 1996. Rehearing denied 453 Mich 1204.

Port Huron Education Association filed an unfair labor practice with
the Employment Relations Commission against the Port Huron
Area School District, alleging that the district refused to bargain
regarding proration of health insurance benefits for teachers who
worked less than a full year, in violation of § 10(1)(e) of the public
employees relations act. The association claimed that payment by
the district of full insurance benefits for all teachers was an estab-
lished past practice that could not be varied without bargaining. A
hearing referee found that the district did not have a duty to bar-
gain because it had already negotiated health insurance proration
in its collective bargaining agreement with the association, and that
its failure to prorate benefits previously as provided in the agree-
ment was a mistake or oversight and not a conscious decision to
amend or alter the agreement. The Employment Relations Commis-
sion reversed, finding that previous payments of insurance benefits
without regard to the date of hiring established a term of employ-
ment about which the district had a duty to bargain. It concluded
that because proration language in the collective bargaining agree-
ment was ambiguous, its acceptance by the association did not
amount to a waiver of the right to bargain. The Court of Appeals,
MacKenzie, P.J., and Hood and White, JJ., affirmed in an unpub-
lished opinion per curiam (Docket No. 135908). The Supreme Court
vacated the decision of the Court of Appeals and remanded the
case to the commission for further consideration. 445 Mich 890
(1994). On remand, the commission concluded that there was no
inherent ambiguity. The district appeals.

In an opinion by Justice Boyle, joined by Chief Justice Brickley,
and Justices Riley, Mallett, and Weaver, the Supreme Court *held*:

Unambiguous contract language controls unless a past practice
is so widely acknowledged and mutually accepted that it amends
the contract. The party seeking to supplant the contract language
must show the parties had a meeting of the minds with respect to
the new terms or conditions so that there was an agreement to
modify the contract. The determination of the Employment Rela-

tions Commission that a term or condition of employment was created because the district tacitly accepted the duty to pay insurance benefits, regardless of the date of hiring, did not provide a basis to conclude that contract language granting the district the authority to prorate benefits had been amended by mutual agreement. Simply because a party knew or should have known it was acting contrary to the collective bargaining agreement is insufficient to overcome express language of an agreement.

1. An employer may defend against a charge that it has unilaterally altered working conditions by arguing that it fulfilled its duty to bargain or that the union waived its right to demand bargaining. Once the employer has fulfilled its duty to bargain, it has a right to rely on the collective bargaining agreement as the statement of its obligations on any topic covered by the agreement. Where a collective bargaining agreement is silent or ambiguous, proof of mutual acceptance may arise by inference from the circumstances; however, where unambiguous language conflicts with the past practice of the parties, a higher standard of proof is required. The unambiguous language controls unless the past practice is so widely acknowledged and mutually accepted that it creates an amendment of the contract. The party seeking to supplant the contract language must prove that the parties had a meeting of the minds with respect to the new terms or conditions, intentionally choosing to reject the negotiated contract and knowingly acting in accordance with the past practice. In such situations, it is the underlying agreement to modify the contract that alters the parties' obligations, not the past practice.

2. In this case, the district's past payment of insurance benefits regardless of the date of hiring was in direct conflict with the proration provision of the collective bargaining agreement. Thus, a higher standard of proof is necessary to establish that the district's past actions superseded the collective bargaining agreement and created a term or condition of employment that could not be modified absent negotiation. To establish that the district accepted the past practice of paying insurance benefits regardless of the date of hiring, the association had to present proof that the district knowingly paid full insurance benefits to employees hired midyear in disregard of contract language to the contrary, with the intent that such action would supplant the proration provisions of the collective bargaining agreement.

Reversed and remanded.

Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that the contract language in this case was ambiguous when considered in connection with the parties' past practice. The school district

committed an unfair labor practice when it unilaterally changed its binding practice of providing persons hired midyear with insurance coverage throughout the following summer to providing only prorated benefits.

The MERC was obligated to follow *Mid-Michigan Ed Ass'n v St Charles Community Schools*, 150 Mich App 763 (1986), but did not do so when it found that the contract language was unambiguous, and, thus, committed a substantial and material error of law. Proper application would have led the MERC to the conclusion that the proration provision was ambiguous. The holding of *Amalgamated Transit Union v Southeastern Michigan Transportation Authority*, 437 Mich 441 (1991), would have applied, and it would have concluded that the district had committed an unfair labor practice when it unilaterally changed a term of employment that the parties had tacitly accepted and reasonably believed would continue.

*Mid-Michigan Ed Ass'n v St Charles Community Schools*, 150 Mich App 763; 389 NW2d 482 (1986), overruled.

*Amberg, McNenly, Zuschlag, Firestone & Lee, P.C.* (by *Joseph H. Firestone*), for the charging-party appellee.

*Fletcher, DeGrow* (by *Gary A. Fletcher* and *John D. Tomlinson*) for the respondent-appellant.

BOYLE, J. A primary goal of the public employees relations act[1] is to resolve labor-management strife through collective bargaining. *Detroit Police Officers Ass'n v Detroit*, 428 Mich 79, 95; 404 NW2d 595 (1987) (opinion of BOYLE, J.). In furtherance of this goal, the PERA imposes a duty on public employers to bargain in good faith over "wages, hours, and other terms and conditions of employment . . . ." MCL 423.215(1); MSA 17.455(15)(1). The parties do not dispute the general principle that "[a] past practice which does not derive from the parties' collective bargaining

[1] 1947 PA 336, as amended by 1965 PA 379 and 1973 PA 25, MCL 423.201 *et seq.*; MSA 17.455(1) *et seq.*

agreement may become a term or condition of employment which is binding on the parties." *Amalgamated Transit Union v Southeastern Michigan Transportation Authority*, 437 Mich 441, 454; 473 NW2d 249 (1991). Rather, the question presented is whether a past practice that is contrary to clear contract language can create a term or condition of employment. We hold that the unambiguous contract language controls unless the past practice is so widely acknowledged and mutually accepted that it amends the contract. The party seeking to supplant the contract language must show the parties had a meeting of the minds with respect to the new terms or conditions so that there was an agreement to modify the contract.

I

In 1978, the Port Huron Education Association and the Port Huron Area School District negotiated and signed a collective bargaining agreement. The agreement contained a clause providing that health insurance benefits would be prorated[2] for teachers who work less than a full year. Specifically, the agreement provided:

> Continued coverage shall be provided to all contracted teachers on a twelve (12) month annual basis or a prorated portion of the year for teachers who work less than a full work year. [Article VII, ¶ Q, § 6.]

---

[2] The parties do not dispute that the agreement contains language addressing the prorationing of health benefits for teachers hired midyear. The association and the district disagree, however, about what prorating means.

This language was placed in each succeeding agreement, including the agreement, for the 1987-88 school year—the year the current dispute arose.

The record is unclear whether there were any teachers hired for less than a full year before the 1983-84 school year. From 1983 to 1987, however, eleven teachers were hired midyear.[3] The district did not prorate insurance benefits for any of these midyear hires, but rather, paid the health insurance premiums for each of the new teachers from the date they were hired through July and August.

During the 1987-88 school year, the district hired eight new teachers after or near the end of the first semester. The unusually large number of midyear hires prompted the district to reexamine the agreement and notice the proration provision. In March, 1988, the district notified the eight new teachers by letter that, in accordance with the agreement, benefits would be prorated because they worked less than a full year and that the district would not provide health insurance benefits for the month of August.[4]

In response to the district's proration notice, the association simultaneously filed a grievance[5] and a demand that the district bargain before enforcing the proration provision. The association was unsuccessful

---

[3] Two teachers were hired midyear in 1983, three in 1984, two in 1985, one in 1986, and three in 1987.

[4] Specifically each letter stated:

  If you were placed on contract around the start of the second semester, your benefits will be in effect through July 31, 1988. You have the right to apply for benefits for August 1988 under COBRA.

[5] In the grievance, the association asserted that " 'proration' means simply that teachers hired after the start of the year are to receive insurance coverage starting with their hire date, rather than retroactive coverage to the beginning of the school year."

at the first two stages of the grievance process and withdrew the grievance before arbitration.

The district responded to the association's demand to bargain by noting that because the proration issue had already been negotiated and included in the collective bargaining agreement, it had no further duty to bargain. The association then filed an unfair labor practice charge, alleging that the district refused to bargain in violation of § 10(1)(e)[6] of the PERA.

The matter was heard before a hearing referee on September 29, 1988. The association alleged that "[n]otwithstanding any term of the existing and prior collective bargaining agreements between the parties," payment of full insurance benefits was an established past practice that could not be varied without bargaining.

The hearing referee recommended dismissal of the association's charge, concluding that the district did not have a duty to bargain about prorating insurance benefits because it had already done so when the agreement was negotiated.[7] The hearing referee further reasoned that the district's failure to prorate benefits before 1988 was simply a mistake or oversight, not a conscious decision by the district to amend or alter the agreement. There was no evidence the dis-

---

[6] MCL 423.210; MSA 17.455(10):

(1) It shall be unlawful for a public employer or an officer or agent of a public employer . . . (e) to refuse to bargain collectively with the representatives of its public employees, subject to the provisions of section 11.

[7] The hearing referee concluded that the prorationing language in the agreement was clear and, noting that the MERC does not involve itself in contract interpretation, refused to admit evidence of the parties' bargaining history.

trict was aware it had not followed the express language of the agreement.

The association filed exceptions to the hearing referee's decision with the MERC.

Relying on *Mid-Michigan Ed Ass'n v St Charles Community Schools*, 150 Mich App 763; 389 NW2d 482 (1986), the MERC reversed the hearing referee's decision and stated:

> Clearly, Respondent either knew or should have known that it was paying insurance benefits to its teachers without regard to hire date. Contrary to the [hearing referee], we find that the parties in this case had tacitly accepted the benefits as a term of employment. [1990 MERC Lab Op 903, 909.]

After deciding that payment of insurance benefits for the entire summer established a term of employment, the MERC concluded that the district had a duty to bargain because the proration language in the agreement was ambiguous and therefore did not amount to a waiver by the association of its right to bargain.

> In the instant case we believe the parties' "proration" language is inherently ambiguous. The contract clause nowhere specifies how benefits will be "prorated." Moreover, as in *Mid-Michigan*, the parties here entered into a new contract with the same identical insurance language after the practice began. Because of the ambiguity of the clause and the bargaining history, the insurance clause here did not demonstrate a clear and unmistakable waiver of the right to bargain. [*Id.*]

The Court of Appeals affirmed the MERC's decision.[8]
The district then . filed an application for leave to
appeal in this Court. Retaining jurisdiction, we
vacated the Court of Appeals decision and remanded
to the MERC for further consideration.[9] Specifically, we
directed the MERC to consider the effect of art VII, ¶ H
of the agreement regarding its conclusion that the
proration language was ambiguous. Paragraph H
states:

   The figure of 185 total duty days for a school year will be
   the basis for computing earned leave time, salary deduc-
   tions, and pro-rations of benefits for those working less
   than a full year, or part-time, it being understood that pro-
   rations for part-time will be made on less than a full-day
   basis.

On remand, the MERC requested and received addi-
tional briefing from the parties. After reviewing the
briefs, the MERC concluded that ¶ H, removed any
ambiguity by clarifying the meaning of the proration
provision:

   Article VII, Section H, clearly provides that teachers hired
   for less than a full year will receive benefits, including

---

[8] Unpublished opinion per curiam, issued May 12, 1993 (Docket No.
135908).

[9] 445 Mich 890 (1994).

   In lieu of granting leave to appeal, the opinion of the Court of
   Appeals is vacated, and the case is remanded to the Michigan
   Employment Relations Commission for further consideration. MCR
   7.302(F)(1). As a necessary part of its opinion, MERC found that
   the proration language in this case is inherently ambiguous,
   because it failed to specify how benefits would be prorated. On
   remand, the commission is to consider the effect of Article VII, ¶ H
   on its conclusion, and issue its opinion on remand within ninety
   days of this order. Jurisdiction is retained. [Dissent of LEVIN, J.,
   omitted.]

health insurance, for that portion of the nonschool year (i.e.
July and August) which corresponds to the proportion of
the number of days worked compared to 185. . . . Those
teachers hired prior to the beginning of the second semes-
ter, i.e. those who worked more than half of the 185 day
school year, were entitled to benefits for the full summer.
Those who were hired after the beginning of the first
semester and who worked less than half of the 185 days
were entitled to benefits for only half the nonworking sum-
mer months.

*   *   *

[W]hen Article V[II], Section Q [the proration provision]
is read together with Article VII, Section H, the parties' con-
tract contains no inherent ambiguity. [1995 MERC Lab Op
42, 45.]

On September 21, 1995, we granted the district's
application for leave to appeal.[10]

II

Public employers have a duty to bargain over
"wages, hours, and other terms and conditions of
employment . . . ."   MCL   423.215(1);   MSA
17.455(15)(1).   Under the PERA, an employer commits
an unfair labor practice if, before bargaining,[11] it uni-
laterally alters or modifies a term or condition of
employment,[12] unless the employer has fulfilled its
statutory obligation or has been freed from it. *Amal-
gamated, supra* at 450; *Ottawa Co v Jaklinski*, 423
Mich 1; 377 NW2d 668 (1985). The employer can ful-

---

[10] 450 Mich 866.

[11] Bargaining in this respect encompasses bargaining to resolution and
memorializing that resolution in the contract or bargaining to impasse.

[12] Insurance benefits are a mandatory bargaining subject. *Allied Chemi-
cal & Alkali Workers of America, Local Union No 1 v Pittsburgh Plate
Glass Co*, 404 US 157, 159; 92 S Ct 383; 30 L Ed 2d 341 (1971).

fill its statutory duty by bargaining about a subject
and memorializing resolution of that subject in the
collective bargaining agreement. *Gratiot Community
Hosp v NLRB*, 51 F3d 1255, 1261 (CA 6, 1995); *NLRB
v United States Postal Service*, 303 US App DC 428,
432; 8 F3d 832 (1993).[13]

An employer may defend against a charge that it
has unilaterally altered working conditions by arguing
that it has fulfilled its duty to bargain or that the
union has waived its right to demand bargaining.[14]
The statutory duty to bargain may be fulfilled by
"negotiating for a provision in the collective bargain-
ing agreement that fixes the parties' rights and fore-
closes further mandatory bargaining . . . ." *Local
Union No 47, Int'l Brotherhood of Electrical Workers
v NLRB*, 288 US App DC 363, 368; 927 F2d 635 (1991).
In that case, the matter is "covered by" the agree-
ment. Alternately, the employer may be freed from its
duty to bargain if the union has waived its right to
demand bargaining. The procedure for determining
whether an employer must bargain before altering a
mandatory subject of bargaining involves a two-step
analysis: is the issue the "union seeks to negoti-
ate . . . 'covered by' or 'contained in' the collective
bargaining agreement; and, if not, [did] the
union . . . somehow relinquish[ ] its right to bar-
gain[?]" *Dep't of Navy v Federal Labor Relations*

---

[13] This Court frequently looks to the federal courts' interpretation of the
National Labor Relations Act in construing the PERA. *Kaleva-Norman-
Dickson School Dist No 6 v Kaleva-Norman-Dickson School Teachers'
Ass'n*, 393 Mich 583, 590-591, n 10; 227 NW2d 500 (1975).

[14] This is not an exclusive list. There are other possible defenses not
relevant to this case, for instance, a denial of the factual allegations or a
claim that the charge is untimely. See MCL 423.216(a); MSA 17.455(16)(a)
(establishing a six-month period of limitations).

*Authority*, 295 US App DC 239, 247; 962 F2d 48 (1992); *United States Postal Service, supra* at 432.

There is a significant difference between whether a subject is "covered by" a collective bargaining agreement and whether the right to bargain about a mandatory subject has been waived by the agreement. In *Dep't of Navy, supra,* Judge Harry T. Edwards, a noted labor law scholar, examined the distinction between "covered by" and "waiver" in great detail. His analysis merits significant quotation:

> A waiver occurs when a union knowingly and voluntarily *relinquishes* its right to bargain about a matter; but where the matter is covered by the collective bargaining agreement, the union *has exercised* its bargaining right and the question of waiver is irrelevant.
>
> *       *       *
>
> Indeed, the difference between the two concepts goes to the structural heart of labor law. When parties bargain about a subject and memorialize the results of their negotiation in a collective bargaining agreement, they create a set of enforceable rules—a new code of conduct for themselves—on that subject. Because of the fundamental policy of freedom of contract, the parties are generally free to agree to whatever specific rules they like, and in most circumstances it is beyond the competence of the Authority, the National Labor Relations Board or the courts to interfere with the parties' choice. . . . On the other hand, when a union *waives* its right to bargain about a particular matter, it surrenders the opportunity to create a set of contractual rules that bind the employer, and instead cedes full discretion to the employer on that matter. For that reason, the courts require "clear and unmistakable" evidence of waiver and have tended to construe waivers narrowly. [*Dep't of Navy, supra* at 248.]

Our precedent reflects the same approach. We analyze whether the term is covered by the contract[15] and require unmistakable evidence to support a claim that the union has waived the statutory right. *Amalgamated, supra* at 461.

### III

The district argues that the authority to prorate benefits is covered by the agreement. The association replies, admitting that the agreement provides for prorationing insurance benefits, but contends that the district's payment of insurance benefits for the entire summer, regardless of the date of hiring, does not conflict with the proration language. As alleged in its grievance and argued before the MERC, the association contends that the proration language means "teachers received coverage only for the period after their date of employment; they were not to receive benefits retroactively." The MERC, on remand, rejected this interpretation, and we affirm that conclusion, finding both that the association's argument is based on a strained reading of the agreement and, more importantly, that the topic is covered by the agreement.

The United States Supreme Court has recognized that a particular course of conduct may violate contractual and statutory duties.

> Hence, it has been made clear that in some circumstances the authority of the [National Labor Relations] Board and the law of the contract are overlapping, concurrent regimes, neither pre-empting the other. Arbitrators and courts are still the principal sources of contract interpretation, but the Board may proscribe conduct which is an unfair labor practice even though it is also a breach of con-

---

[15] See *Jaklinski, supra.*

tract remediable as such by arbitration and in the courts. It may also, if necessary to adjudicate an unfair labor practice, interpret and give effect to the terms of a collective bargaining contract. [*NLRB v Strong*, 393 US 357, 360-361; 89 S Ct 541; 21 L Ed 2d 546 (1968) (citations omitted).]

In cases in which statutory and contractual issues overlap, the MERC, like the NLRB, must often review the contract to determine whether there is a statutory violation. The MERC does not involve itself with contract interpretation when the agreement provides a grievance process that culminates in arbitration. *Sanilac Co Bd of Comm'rs v Sanilac Co Employees*, 1993 MERC Lab Op 750, 755; *Police Officers Ass'n of Michigan v Romulus*, 1992 MERC Lab Op 170. When the unfair labor charge is the failure to bargain, however, it is often necessary for the MERC, like the NLRB, to review the terms of an agreement to ascertain whether a party has breached its statutory duty to bargain. See *Detroit Fire Fighters Ass'n v Detroit*, 408 Mich 663; 293 NW2d 278 (1980); Edwards, *Deferral to arbitration and waiver of the duty to bargain: A possible way out of everlasting confusion at the NLRB*, 46 Ohio St L J 23, 24 (1985) (describing a similar requirement for the NLRB). In reviewing an agreement for any PERA violation, the MERC's initial charge is to determine whether the agreement "covers" the dispute. If the term or condition in dispute is "covered" by the agreement, the details and enforceability of the provision are left to arbitration.

Where there is a contract covering the subject matter of a dispute, which has provisions reasonably relied on for the action in question, and the contract also has a grievance procedure with final and binding arbitration, the Commission finds that the contract controls and no PERA issue is

presented. [*St Clair Co Rd Comm v Local 516M Service Employees Int'l Union*, 1992 MERC Lab Op 533, 538.][16]

The district's duty to bargain is the only provision of the PERA implicated by the association's complaint in this case.[17] See n 6. As this Court noted over twenty years ago, "[a]fter the parties have met in good faith and bargained over the mandatory subjects placed upon the bargaining table, they have satisfied their statutory duty." *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 55; 214 NW2d 803 (1974), citing *NLRB v American Nat'l Ins Co*, 343 US 395, 404; 72 S Ct 824; 96 L Ed 2d 1027 (1952).

To determine whether the district violated the PERA, the MERC on remand examined the agreement and concluded the proration provisions were unambiguous. As noted in *Amalgamated, supra*, "[o]ur review of the commission's decision is circumscribed by the statutory mandate that factual findings by the commission are conclusive if supported by competent, material, and substantial evidence on the record considered as a whole." *Id.* at 450, citing MCL 423.216(e); MSA 17.455(16)(e), Const 1963, art 6, § 28. Courts do not accord legal rulings by the MERC the same level of

---

[16] A subject need not be explicitly mentioned in an agreement in order for the subject to be "covered by" the agreement. *Dep't of Navy, supra* at 252. However, if the subject is "covered by" the agreement, the "clear and unmistakable standard," the standard that the initial MERC panel relied on, is not applicable. The NLRB has held in similar situations, a matter does not have to be explicitly mentioned in the agreement in order to be "covered by" the agreement. *C & S Industries, Inc v United Electrical, Radio & Machine Workers of America*, 158 NLRB 454, 459 (1966); *Dunham-Bush, Inc v Capital City Lodge No 354*, 264 NLRB 1347, 1348, n 4 (1982).

[17] The unfair labor charge does not involve the enforceability of the district's actions because contract interpretation is an issue to be solved through the grievance process. The only issue before the MERC is whether the district had a duty to bargain.

deference,[18] however, and such determinations "are set aside if they are in violation of the constitution or a statute, or affected by a substantial and material error of law." *Id.*, citing MCL 24.306(1)(a), (f); MSA 3.560(206)(1)(a), (f). *Southfield Police Officers Ass'n v Southfield*, 433 Mich 168; 445 NW2d 98 (1989).

The initial question whether contract language is ambiguous is a question of law. If the contract language is clear and unambiguous, its meaning is a question of law. *Dykema v Muskegon Piston Ring Co*, 348 Mich 129, 138; 82 NW2d 467 (1957). Where the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact. *Zinchook v Turkewycz*, 128 Mich App 513; 340 NW2d 844 (1983).

In this case, the second MERC panel concluded that the proration language was unambiguous as a matter of law. After reviewing the agreement, we find that the MERC's decision regarding ambiguity is not affected by an error of law, nor is it in violation of any constitutional or statutory prohibition.

We agree with the MERC that the association's interpretation of the proration language is illogical. The district could not provide health insurance coverage for losses previously incurred by the new teachers before being hired. The purpose of insurance is to cover contingent losses, not losses that are known with certainty to have already occurred. "No coverage

---

[18] Although our deference to the MERC is less with regard to questions of law, "[t]he Michigan Employment Relations Commission is the state agency specially empowered to protect employees' rights [and] [w]hile this Court is not bound by the decisions of that agency, we acknowledge the MERC's expertise and judgment in the area of labor relations." *Jaklinski, supra* at 24, n 10; *MERC v Detroit Symphony Orchestra*, 393 Mich 116, 124; 223 NW2d 283 (1974).

exists for events that must happen or that have happened." *CPC Int'l, Inc v Aerojet-General Corp*, 825 F Supp 795, 809 (WD Mich, 1993), citing *Nash v New York Life Ins Co*, 272 Mich 680, 682; 262 NW 441 (1935). Thus, because the district could not have provided retroactive coverage, the association's interpretation would render the proration provision superfluous.

We do not address the outer limits of when a subject is "covered by" an agreement. The language granting the district the right to prorate benefits in ¶ Q of the agreement, and the additional language in ¶ H identifying the method by which benefits will be prorated, does not implicate that question. The association does not dispute that prorationing of benefits is addressed in the agreement. Thus, under any reasonable definition of the term "covered by," we conclude the prorationing of insurance benefits is "covered by" the agreement.

IV

The association argues that, even if the agreement unambiguously grants the district the authority to prorate benefits, the conduct of the district established an enforceable past practice.

The association's unfair labor practice charge illustrates that the dispute in this case is not grounded in contract interpretation alone. Specifically, the association's charge alleged:

> *Notwithstanding any term of the existing and prior collective bargaining agreements between the parties*, it has been the established past practice of the Respondent to continue insurance benefits on a twelve month basis for all members of the Charging Party without regard to whether a

member of the Charging Party has worked a full year.
[Emphasis added.]

Notwithstanding the unambiguous proration language in the agreement, the association's charge is that the district's previous method of paying insurance benefits throughout the summer created a term of employment that could not be altered absent waiver or bargaining.

The parties do not dispute the general principle that a past practice may create a term or condition of employment that cannot be altered unilaterally absent negotiation. The question in this case is whether a past practice supersedes express contract language to the contrary.

In order to create a term or condition of employment through past practice, the practice must be mutually accepted by both parties. *Amalgamated, supra* at 454. Where the collective bargaining agreement is ambiguous or silent on the subject for which the past practice has developed, there need only be "tacit agreement that the practice would continue." *Amalgamated, supra* at 454-455.[19] However, where

---

[19] In *Amalgamated,* the Amalgamated Transit Union filed an unfair labor charge against the Southeastern Michigan Transportation Authority, alleging that SEMTA had unilaterally altered a term or condition of employment when it refused to bargain about a change in the disciplinary procedure for probationary employees. SEMTA responded that it had no duty to bargain about the change in disciplinary procedure for two reasons pertinent to this case: 1) the previous method of discipline had not become a term or condition of employment, and 2) the union had waived its statutory right to bargain regarding discipline of probationary employees.

This Court rejected SEMTA's arguments. Noting that *Amalgamated* did not present a situation in which the parties' past practice was contrary to the collective bargaining agreement, we concluded that the parties had mutually accepted the disciplinary process applied to probationary

the agreement unambiguously covers a term of
employment that conflicts with a parties' past behav-
ior, requiring a higher standard of proof facilitates the
primary goal of the PERA—to promote collective bar-
gaining to reduce labor-management strife. A less
stringent standard would discourage clarity in bar-
gained terms, destabilize union-management relations,
and undermine the employers' incentive to commit to
clearly delineated obligations.

Requiring a higher standard of proof when there is
express contract language to the contrary comports
with previous Michigan cases regarding modification.
Generally, parties are free to take from, add to, or
modify an existing contract. *Soltys v Soltys*, 336 Mich
693; 59 NW2d 54 (1953). However, in the same way a
meeting of the minds is necessary to create a binding
contract, so also is a meeting of the minds necessary

---

employees and that competent and substantial evidence supported the
MERC's decision that SEMTA's past practice created a term or condition
of employment that could not be unilaterally altered absent bargaining.
Although SEMTA correctly argued that the agreement conferred "discre-
tion to discharge probationary employees," the process contested by the
union dealt with discipline of probationary employees. *Id.* at 456. The
agreement simply removed SEMTA's obligation to demonstrate that dis-
charge of probationary employees was fair and in accord with established
policies. The agreement did not release SEMTA from the obligation to bar-
gain with the union over disciplinary procedures applicable to probation-
ary employees. Thus, unlike the present case, in which the authority to
prorate health benefits is explicitly covered by the agreement, the discipli-
nary procedures for probationary employees were not covered by the
agreement.

We also rejected SEMTA's argument that the union had waived its right
to bargain over disciplinary procedures. Waiver of statutorily protected
rights requires "clear and unmistakable" language indicating that the
union consciously yielded its rights to negotiate." *Id.* at 461. SEMTA's
authority to judge "the ability, competency, fitness, and other qualifica-
tions of new operators" did not constitute a "clear and unmistakable"
waiver of the union's right to bargain over modification of the disciplinary
process for new operators.

to modify the contract after it has been made. *Universal Leaseway System, Inc v Herrud & Co*, 366 Mich 473; 115 NW2d 294 (1962). A collective bargaining agreement, like any other contract, is the product of informed understanding and mutual assent. To require a party to bargain anew before enforcing a right set forth in the contract requires proof that the parties knowingly, voluntarily, and mutually agreed to new obligations.

We view this situation as being parallel to a waiver of the union's right to demand bargaining. That parallelism is noted by Judge Edwards in the passage quoted previously on page 319. Once the employer has fulfilled its duty to bargain, it has a right to rely on the agreement as the statement of its obligations on any topic "covered by" the agreement. "[T]he courts require 'clear and unmistakable' evidence of waiver and have tended to construe waivers narrowly. See *Metropolitan Edison Co v NLRB*, 460 US 693, 708-709; 103 S Ct 1467; 75 L Ed 2d 387 (1983); *NLRB v Brown-Graves Lumber Co*, 949 F2d 194, 198 (CA 6, 1991)." *Dep't of Navy, supra* at 248.

While we acknowledge the inherent difference between unfair labor practice charges and contract arbitration, we also find support in labor arbitration opinions for requiring a higher standard of proof in situations where the agreement conflicts with the parties past actions. As the association notes, an arbitrator's conclusions regarding contract interpretation are not binding in unfair labor practice proceedings. *Amalgamated, supra* at 452-453. However, we find no reason not to adopt the arbitrators' analysis regarding the relationship between clear contract language and the parties past actions.

> To vary the clear written mandates of the contract, the understanding or past practice must be evidenced by substantially stronger evidence than when utilized to interpret ambiguous language or to fill in areas where the contract is silent. [*Buchholz Mortuaries, Inc v Embalmers Federal Labor Union No 21301*, 69 Lab Arb (BNA) 623, 626 (Roberts, 1977).]

The different standards of proof are well developed in labor-management arbitration. In labor arbitration, past practice is admissible for three primary purposes:

> (1) to provide the basis of rules governing matters not included in the written contract; (2) to indicate the proper interpretation of ambiguous contract language; or (3) to support allegations that clear language of the written contract has been amended by mutual action or agreement. [Elkouri & Elkouri, *How Arbitration Works* (4th ed), p 437.]

Where the agreement is silent or ambiguous, proof of mutual acceptance may arise "by inference from the circumstances." *Id.*, p 439. See also *US Industrial Chemicals Co v United Paperworkers Int'l Union*, 76 Lab Arb (BNA) 620, 623 (Levy, 1981). It is sufficient that the party "knew or should have known" of the alleged practice. *Owens-Corning Fiberglas Corp v Textile Workers Union of America (CIO)*, 19 Lab Arb (BNA) 57, 63 (Justin, 1952). Where unambiguous language in the agreement conflicts with the past practice of the parties, however, a higher standard of proof is required.[20]

---

[20] To the extent that *Mid-Michigan Ed Ass'n v St Charles Community Schools*, *supra*, stands for the proposition that a term or condition of employment unambiguously covered by the contract is modified by the payment of benefits, without the intent that the payment would act as an amendment to modify the agreement, it is overruled.

> The highest quantum of proof will ordinarily be required in order to show that the parties intended by their conduct to amend or modify clear and unambiguous contractual language, however. [*Total Petroleum, Inc v Int'l Union of Operating Engineers, Local 670*, 78 Lab Arb (BNA) 729, 737 (Roberts, 1982).]

The unambiguous language controls unless the past practice is so widely acknowledged and mutually accepted that it creates an amendment to the contract.

> While, to be sure, parties to a contract may modify it by a later agreement, the existence of which is to be deduced from their course of conduct, the conduct relied upon to show such modification must be unequivocal and the terms of modification must be definite, certain, and intentional. [*Gibson Refrigerator Co v United Automobile, Aircraft & Agricultural Implement Workers, Local 137*, 17 Lab Arb (BNA) 313, 318 (Platt, 1951).]

The party seeking to supplant the contract language must submit proofs illustrating that the parties had a meeting of the minds with respect to the new terms or conditions—intentionally choosing to reject the negotiated contract and knowingly act in accordance with the past practice. See Elkouri & Elkouri, p 455. In such situations, it is the underlying agreement to modify the contract that alters the parties' obliga-

---

Aside from the fact that we believe *St Charles* was improperly decided, the dissent's reliance on that case is flawed. The school district's actions in *St Charles* were not the result of a "tacit agreement" between the district and its employees to act in contravention of the collective bargaining agreement, but, rather, because the district believed it was required to follow an erroneous attorney general opinion that was subsequently overruled. See *Farmington Ed Ass'n v Farmington School Dist*, 133 Mich App 566; 351 NW2d 242 (1984).

tions, not the past practice. *Ford Motor Co v United Automobile, Aircraft & Agricultural Workers, Local 600*, 19 Lab Arb (BNA) 237, 241-242 (Shulman, 1952).

Courts, even more than arbitrators, should be wary of raising the parties' past actions to the same status as the written provisions in the agreement. In creating the agreement the parties deliberately bargained for certain adjustments and concessions. The agreement embodies mutual assent and, during the duration of the contract, either party should be able to rely on the provisions previously bargained for during negotiation of the agreement. Allowing the agreement to be superseded by anything less than a purposeful decision evidencing similar deliberation would

> "create the anomaly that, while the parties expend great energy and time in negotiating the details of the Agreement, they unknowingly and unintentionally commit themselves to unstated and perhaps more important matters which in the future may be found to have been past practice." [Elkouri & Elkouri, p 441, quoting *Ford Motor Co, supra* at 242.]

These observations distinguish this case and *Amalgamated*. The agreement in *Amalgamated* did not address the disciplinary procedure applicable to probationary employees. The subject was not "covered by" the contract and the proofs were insufficient to rebut the presumption that the union had not waived the right to bargain. In the present case, where the district's past payment of insurance benefits for the entire summer was in direct conflict with the agreement, a higher standard of proof is necessary to establish that the district's past actions superseded the agreement and created a term or condition of

employment that could not be modified absent negoti-
ation. To establish that the district accepted the past
practice of paying insurance benefits, the association
had to present proof that the district knowingly paid
employees hired midyear insurance benefits for the
entire summer in disregard of contract language to
the contrary, with the intent that such payment would
supplant the agreement.

V

The MERC's original determination that a term or
condition of employment was created because the
district tacitly accepted the duty to pay insurance
benefits for the full summer, regardless of the date of
hiring, did not provide a basis to conclude that con-
tract language granting the district the authority to
prorate benefits had been amended by mutual agree-
ment. The MERC did not find the previous payments of
insurance benefits were anything more than a mis-
take.[21] Rather, the MERC concluded that the district

---

[21] The hearing referee concluded, that the agreement covered proration
of insurance benefits and that the district's failure to prorate insurance
benefits previously had simply been a mistake. The conclusion that a mis-
taken payment of benefits did not create a past practice is well supported.
See *Highland Park School Dist v Highland Park Ass'n of School Admin-
istrators*, 1976 MERC Lab Op 622 (mistaken payments to the retirement
fund for over nine months could be terminated unilaterally when the mis-
take was discovered); *Clinton Twp v Clinton Twp Office Personnel, Local
1103*, 1975 MERC Lab Op 32 (a mistake in paying union employees a 5.5
percent raise for one month could be unilaterally terminated by the
county).

In *Montcalm Co v Police Officers Ass'n of Michigan*, 1990 MERC Lab
Op 954, the agreement provided medical insurance benefits only to full-
time employees. For over a year, however, the county erroneously paid
medical insurance benefits to part-time employees. When the county
noticed the error, it refused to pay benefits for new part-time employees.
The officers' association filed an unfair labor practice, alleging that the
county was changing unilaterally a term or condition of employment. As
in the present case, the MERC concluded that payment of medical bene-

had accepted the obligation to pay insurance benefits for the entire summer because it "knew or should have known" that it was acting contrary to the agreement. Simply because a party "knew or should have known" it was acting contrary to the agreement is insufficient to overcome express language of the agreement.[22]

Thus, we reverse the decision of the Court of Appeals and remand this case to the MERC for proceedings consistent with this opinion.

BRICKLEY, C.J., and RILEY, MALLETT, and WEAVER, JJ., concurred with BOYLE, J.

CAVANAGH, J. (*dissenting*). I do not agree with the majority's analysis or conclusion on the issue whether a past practice supersedes express contract language to the contrary. The majority holds that the instant contract language is unambiguous, and thus the contract language controls, unless the past practice is so widely acknowledged and mutually accepted that the parties, in effect, agreed to modify the contract.[1] I dis-

---

fits had been a mistake and that the county did not commit an unfair labor practice by returning to the contract language and refusing to pay insurance benefits for part-time employees not covered by the agreement.

[22] The record in this case provides no evidence that the district intentionally paid summer insurance benefits to teachers hired midyear. Testimony before the hearing referee indicates that insurance benefits were not paid as a result of a cognizant or deliberate decision by the district, but rather as a result of mere happenstance or oversight. The district could only have prorated benefits for at most three teachers during any of the school years before 1987. The district's testimony that it merely overlooked prorating benefits for the one to three teachers hired each year midway through the 1982-86 school years—out of a 610- to 630-person payroll—is undisputed.

[1] I note that this is the specific holding. However, later in the opinion, it also appears to require evidence of a "purposeful decision evidencing similar deliberation [as in the collective bargaining agreement negotiations] . . . ." *Ante* at 330. Further, the majority opinion would also

sent from this holding because I prefer the analysis presented in *Mid-Michigan Ed Ass'n v St Charles Community Schools*, 150 Mich App 763; 389 NW2d 482 (1986). I would hold that the contract language was ambiguous when considered in connection with the parties' past practice. Thus, I would also hold that the school district committed an unfair labor practice when it unilaterally changed its binding practice of providing persons hired midyear with insurance coverage throughout the following summer to providing only prorated benefits.

## I. THE MERC'S DECISION

On many occasions, this Court has recognized the MERC's expertise and judgment in the labor relations area. This recognition is embodied in the rule that findings of fact made by the MERC are conclusive if they are supported by substantial, material, and competent evidence on the record as a whole. Const 1963, art 6, § 28, MCL 423.216(e); MSA 17.455(16)(e). However, the MERC's legal rulings are not given the same level of deference; a court will set them aside if they are in violation of the constitution or a statute, or if they are affected by a substantial and material error of law. MCL 24.306(1)(a), (f); MSA 3.560(206)(1)(a), (f).

---

require the association "to present proof that the district knowingly paid employees hired midyear insurance benefits for the entire summer in disregard of contract language to the contrary, with the intent that such payment would supplant the agreement." *Id.* at 331. The opinion also states that the parties must have "knowingly, voluntarily, and mutually agreed to new obligations." *Id.* at 327. We interpret these later statements to be indicators of a past practice that is widely acknowledged and mutually accepted, and not as additional requirements for the charging party to hurdle.

In its initial decision, the MERC found that the district's past practice of paying full benefits to all teachers regardless of the date of hiring established a binding term of employment.[2] I would affirm this finding because the competent evidence on the record supports a finding that a past practice existed and rose to the level of a term of employment.[3]

Additionally, in its original decision, the MERC concluded that, as a matter of law, the proration language was ambiguous. However, after appellate proceedings, a majority of this Court vacated the deci-

---

[2] The district paid full summer benefits to teachers hired midway through the school years 1983-87: two in 1983, three in 1984, two in 1985, one in 1986, and three in 1987.

[3] As this Court stated in *Amalgamated Transit Union v Southeastern Michigan Transportation Authority*, 437 Mich 441, 454-455; 473 NW2d 249 (1991):

> A past practice which does not derive from the parties' collective bargaining agreement may become a term or condition of employment which is binding on the parties. The creation of a term or condition of employment by past practice is premised in part upon mutuality; the binding nature of such a practice is justified by the parties' tacit agreement that the practice would continue. The nature of a practice, its duration, and the reasonable expectations of the parties may justify its attaining the status of a "term or condition of employment."

In the instant review of the MERC's decision, the Court of Appeals explained:

> [T]he school district allowed the practice of paying year-round benefits to all teachers to continue for ten years. There was no isolated mistake or oversight. Accordingly the nature and duration of the practice was sufficient to support a finding that a past practice existed. It also met the reasonable expectation of the parties, in that several times during the ten years they continued to negotiate bargaining agreements. The maintenance of coverage for employees during the summer break time could reasonably be expected. Both parties bargained over the subject matter of health insurance and created provisions for coverage under the collective bargaining agreement. [Unpublished opinion per curiam, issued May 12, 1993 (Docket No. 135908).]

sion of the Court of Appeals and remanded to the MERC to consider another provision of the collective bargaining agreement that, although not cited by either party, may have removed the ambiguity by clarifying the meaning of the proration provision.[4]

On remand, the MERC concluded that the proration provision was unambiguous as a matter of law. I disagree with this legal ruling by the MERC, and with the majority's finding that the MERC's decision regarding ambiguity was not affected by an error of law.[5] The MERC was obligated to follow the precedent established in *St Charles*, but did not do so when it found that the contract language was unambiguous.

## II. *ST CHARLES*

In *St Charles*, the collective bargaining agreement contained a provision wherein the employer agreed to provide employees with hospitalization-medical insur-

---

[4] 445 Mich 890 (1994). In that order, I joined Justice LEVIN's statement in which he stated that he would have denied leave to appeal. As he indicated, the remand order would not assist in resolving the question whether the MERC erred in concluding that the practice superseded the specific language of the collective bargaining agreement. If this Court had wanted to resolve the question left open by *Amalgamated*, it could have done so without a remand. As Justice LEVIN noted, "Remand might, however, bring about a change in the result at the MERC level because the entire membership of the MERC has changed since it issued its opinion in this case." *Id.* at 893, n 2. On remand, the MERC did change its legal ruling on the ambiguity issue. Thus, the MERC's conclusion regarding ambiguity depended on the composition of the board. Yet, the majority cursorily accepts the second MERC decision as "not affected by an error of law . . . ." *Ante* at 323. Also, I note that on remand, the MERC did not comment on or reverse its initial decision that the district had committed an unfair labor practice. I do not believe it could have done so if it properly resolved the issue under *St Charles*.

[5] Although I believe that the proration provision was ambiguous according to the reasoning in *St Charles*, I also believe that provision was ambiguous on its face (i.e., not considering the effect of the past practice). An indication of this ambiguity can be found in the fact that it took the MERC several lines to explain what the provision means.

ance, provided that the employee was not covered by any other insurance carrier for such insurance. However, in spite of that provision, and for a period of about three years, the employer allowed coordination of benefits. The Court of Appeals held that the employer's past practice of allowing coordinated benefits, although contrary to the contract provision, constituted a term of employment that could not be changed unilaterally. The employer was required to provide the union with notice and an opportunity to bargain and could not simply revert to enforcing the language of the collective bargaining agreement. Because it did not provide notice and an opportunity to bargain, the employer had committed an unfair labor practice.

The Court stated that "when an employer implements and continues a practice which is contrary to a contractual provision, the practice may constitute a term or condition of employment which is not subject to unilateral change." *St Charles* at 769. Because the employer permitted the practice to continue, knowing that it was contrary to the contract, the employer could not then rely on the contractual language to unilaterally change the practice.

The MERC found that the contract did not clearly preclude coordinated benefits coverage. To support its finding it noted that the parties apparently believed that the language was sufficiently ambiguous to permit coverage because neither party attempted to change the language during later contract negotiations. The Court explained:

> Although the contractual language, standing alone, is not inherently ambiguous, it becomes susceptible to interpretation when examined in connection with the parties' past

practice. "Where past practice has established a meaning for language that is used by the parties in a new agreement, the language will be presumed to have the meaning given to it by past practice." Here, the parties' incorporation of the disputed contractual provision in their . . . collective bargaining agreement must be viewed in terms of the district's past practice of providing coordinated health care benefits. Accordingly, the union could have construed the provision as permitting the continuation of the practice. [*Id.* at 770 (citation omitted).]

### III

In the instant case, the MERC should have concluded that the proration provision was ambiguous when considered in conjunction with the parties' past practice. Even if the provision was not inherently ambiguous when considered along with another provision on remand, the proration provision was subject to interpretation because of the parties' past practice. Because the parties entered into a new contract each year after the employer had begun providing uninterrupted benefits for persons hired midyear, the employees could have interpreted the contract language as permitting the continuation of the practice.

As noted by the majority, when the collective bargaining agreement is ambiguous on the subject for which the past practice has developed, there need only be "tacit agreement that the practice would continue." *Amalgamated Transit Union v Southeastern Michigan Transportation Authority*, 437 Mich 441, 454-455; 473 NW2d 249 (1991). I agree with and would affirm the MERC's original finding that the parties in this case had tacitly accepted the benefits as a term of employment because that finding is supported by competent evidence on the whole record.

IV

The MERC committed a substantial and material error of law in failing to apply *St Charles* to the facts of this case. If it had been properly applied, the MERC would have concluded that the proration provision was ambiguous. Then, our holding in *Amalgamated* would have applied, and the MERC would have concluded that the district had committed an unfair labor practice when it unilaterally changed a term of employment that the parties had tacitly accepted and reasonably believed would continue.

In this case, the employer had an obligation to bargain over changes in the past practice of providing uninterrupted insurance coverage for persons hired midyear *independent* of its contractual obligations. My resolution of this issue does not require the employer to provide this coverage. Further, it does not involve the remaking of the contract; nor does it force the employer to agree to a proposal or concession. However, it does require it to bargain with the union on this issue. This resolution will advance the basic goal of the public employees relations act: resolution of labor-management strife in the public sector through collective bargaining.

Levin, J., concurred with Cavanagh, J.