BUTLER v WAYNE COUNTY

Docket No. 290361. Submitted April 14, 2010, at Detroit. Decided May 27, 2010. Approved for publication September 7, 2010, at 9:00 a.m.

Rosemary Butler and others representing a class consisting of retirees of Wayne County who, before retirement, were represented by Michigan AFSCME Counsel 25, and its Locals 25, 101, 409, or 1659 and who purchased supplemental life insurance (SLI) from the county upon retirement, brought an action in the Wayne Circuit Court against the county and its retirement board, claiming that defendants breached their contract to provide a fixed flat-rate premium for the SLI of $2.36 per thousand dollars of insurance a month when defendants switched to an age-rated-premium structure for SLI coverage. The parties relied on two documents that they stipulated as joint exhibits: the collective-bargaining agreement between the county and the locals effective December 1, 2000, to November 30, 2004 (the CBA), and the Wayne County health and welfare benefit plan description effective December 1, 1990 (the plan). The parties also stipulated that the CBA and the plan were the only documents governing the dispute and that any prior collective-bargaining agreements were to be considered for background purposes only. Although initially disputed, the parties agreed by the time of trial that defendants had a contractual obligation to make SLI available to retirees. The court, Prentis Edwards, J., held that defendants were free to increase the amount of the premium charged for SLI from $2.36 per thousand a month, in light of evidence that the premiums had increased over time, determined that there was no evidence of an agreement to provide subsides to retirees for the cost of SLI, and concluded that the length, widespread knowledge, and consistency of the practice of providing SLI at a flat-rate premium created a reasonable expectation that the practice would continue, making the practice binding on the parties. Defendants appealed the holding that plaintiffs are entitled to a flat-rate-premium structure on the basis of a vested right created by the past practice of the parties.

The Court of Appeals held:

1. The CBA expressly provided that SLI would, at some point, be changed to an age-rated-premium structure and that retirees would be eligible to transfer to that plan. The express language of the CBA, as modified through the incorporation of the plan, provided that there was no express contractual right to a flat-rate-premium structure.

2. The past-practice doctrine is applicable in this case, although in a limited context. The doctrine may only be used in this case to establish that a contractual right to a flat-rate-premium structure existed at the time of retirement as a result of a past practice that modified the contract under which the retiree retired.

3. When a collective-bargaining agreement is ambiguous or silent on the subject for which the past practice has developed, there need only be tacit agreement that the practice would continue. However, where a past practice is clearly contrary to clear contract language, the unambiguous contract language controls unless the past practice is so widely acknowledged and mutually accepted that it amends the contract. The party seeking to supplant the contract language must show that the parties had a meeting of the minds with respect to the new terms or conditions so that there was an agreement to modify the contract.

4. There is no merit to plaintiffs' contention that there was no provision contained in the CBA that related to how the SLI rate would be calculated. Plaintiffs' allegation of a past practice prohibiting a change from a flat-rate-premium structure conflicts with the express contract language. The unambiguous contract language controls unless the past practice was so widely acknowledged and mutually accepted that it amended the contract.

5. The SLI provision contained in the plan was not ambiguous. The only way to read the CBA and the plan provisions to hold that retirees are entitled to SLI requires interpreting the SLI provisions related to "employees" as including "retirees." Once "retirees" are read into the plan's SLI provisions, it becomes clear that they are subject to the age-related-premium system that was to be provided to employees "at the County's option." The union had notice of these provisions. There was never a meeting of the minds with regard to whether the flat-rate-premium structure was to exist in perpetuity and, therefore, no agreement to modify the contract.

6. Because the plan and the CBA expressly permitted defendants, at their option, to implement an age-related-premium structure, the fact that defendants inserted the language regarding that option in 1991 but did not implement the change until 2007 did not, by itself, constitute a past practice that would amend

the CBA. The trial court erred when it concluded that there was a past practice that amended the CBA to provide a contractual right to a perpetual flat-rate-premium structure. The trial court's determination that plaintiffs are entitled to a flat-rate-premium structure on the basis of a vested contract right must be reversed and the case must be remanded to the trial court for the entry of an order permitting defendants to change the SLI premium structure to an age-rated structure.

Reversed and remanded.

1. Master and Servant — Pensions — Vested Retirement Rights — Past-Practice Doctrine.

Vested retirement rights may not be altered without the pensioner's consent; a retiree's contractual rights vest, if at all, at the time of retirement absent explicit contractual language to the contrary; a retiree relying on the past-practice doctrine to show that a past practice may have amended a contract covering the retiree before the retiree retired must show that the past practice had modified the contract under which the retiree retired; a claim based on the past-practice doctrine must fail if any of the actions upon which the retiree relies to assert a past practice occurred after the retiree's date of retirement.

2. Contracts — Past-Practice Doctrine.

When a past practice of the parties to a contract is clearly contrary to the clear language of the contract, the clear language controls unless the past practice is so widely acknowledged and mutually accepted that it amends the contract; the party seeking to supplant the contract language must show that the parties had a meeting of the minds with respect to the new terms or conditions so that there was an agreement to modify the contract.

*Miller Cohen, P.L.C.* (by *Bruce A. Miller*), for plaintiffs.

*Clark Hill PLC* (by *Reginald M. Turner, Paul W. Coughenour,* and *Stephanie J. Clifford*) for defendants.

Before: Bandstra, P.J., and Borrello and Shapiro JJ.

Per Curiam. This contract dispute arises from defendants' attempt to change the premium structure of

retiree supplemental life insurance (SLI) from a flat-rate-premium structure to an age-rated-premium structure, which resulted in higher premiums for older retirees. Defendants appeal as of right from the trial court's order after a bench trial holding that plaintiffs are entitled to a flat-rate-premium structure on the basis of a vested right created by the past practice of the parties. We reverse and remand for entry of an order permitting defendants to change the SLI premium structure to an age-rated structure.

## I. BASIC FACTS AND PROCEDURAL HISTORY

In this class-action lawsuit, plaintiffs are named plaintiffs representing the class consisting of retirees of defendant Wayne County (the county) who, before retirement, were represented by Michigan AFSCME Council 25, and its Locals 25, 101, 409, or 1659,[1] and who purchased SLI from the county upon retirement.

The parties primarily rely on two documents, which they stipulated as joint exhibits: the collective-bargaining agreement between the county and AFSCME Locals 25, 101, 409, and 1659 effective December 1, 2000, to November 30, 2004 (the CBA), and the Wayne County health and welfare benefit plan description effective December 1, 1990 (the Plan).

The county provides, at its expense, $20,000 of life insurance coverage to current employees and $5,000 of life insurance coverage to retirees. Employees or retirees who wish to purchase SLI may do so at their own expense.

Plaintiff Nora Raymond retired in 1983. At retirement, Raymond originally paid $8.74 a month for

---

[1] The order that allowed the action to be maintained as a class action also ordered that the name of the union be removed from the caption of the pleadings.

$11,500 in SLI. Over time, this rate increased to $27.14 a month for the same amount of coverage. She never objected to the increase in premiums and continued to pay for coverage.

Plaintiff Rosemary Butler retired in 2002. She did not discuss SLI when she met with her retirement representative. She was, however, given a document titled "As You Retire. . . . Wayne County Retirees Fact and Information Guide" that provided that "[s]upplemental life insurance can be continued at a maximum of $11,500 by monthly payroll deduction, if applicable." Although she did not talk to anyone regarding SLI premium rates, she "was under the impression" that the premium rates were the same for retirees as for active employees because the document indicated that SLI was a continued benefit.

Before February 2005, the amount that retirees paid in premiums for SLI matched the cost to the county for the SLI. In February 2005, Prudential Insurance Company informed the county that the existing SLI premium rate of $2.36 per thousand dollars of insurance coverage was insufficient. Rather than permit the liability for the SLI to become unfunded and have the policies cancelled, Jack Underwood, Director of Risk Management for Wayne County, made the unilateral decision to use excess funds contained in an Insurance Continuation Fund (ICF), established to buy out the county's liability for basic life insurance for certain retirees, to pay the difference "until a decision was made as to whether or not the County was going to notify retirees that they would now be going to an age banded rate premium."

When the ICF funds were depleted by August 2005, Underwood unilaterally authorized the county to continue subsidizing the premium rate for retiree SLI from

the county's general fund to prevent the policies from being cancelled. Underwood had no authority to bind the county to an obligation to pay the benefits. When Underwood informed Carla Sledge, Chief Financial Officer for Wayne County, that the policies would be cancelled without the subsidization or a change in premium rates, Sledge said that it was inappropriate for the county to subsidize the "difference between the $2.36 and the amount that would need to be paid for the age-banded rate."

Prudential, the insurance company providing SLI, indicated that to properly fund the SLI, either a flat rate of $5.44 would be required of all employees, or an age-rated premium could be implemented, making costs "equitable for all participants, so a younger employee obviously would pay less premium than an older person." Rather than increasing the flat-rate premium to cover the SLI cost, the county elected to switch to the age-rated-premium structure, to become effective January 1, 2007. On October 12, 2006, Ronald Yee, on behalf of defendants, authored a letter notifying retirees of the new SLI premium rates and the age-rated-premium structure. Raymond and Butler both received this letter and, on the basis of the increased premium, elected to discontinue their coverage.

Plaintiffs subsequently filed this class-action suit on April 18, 2007, claiming that defendants breached their contract to provide a fixed flat-rate premium of $2.36 per thousand dollars of insurance a month for SLI. On April 25, 2008, plaintiffs filed their first-amended class-action complaint for injunctive relief. Despite the fact that the class clearly contained plaintiffs who retired before the enactment of the CBA and the Plan, plaintiffs argued that when defendants notified retirees on October 18, 2006, that defendants had changed to an

age-rated premium, "[t]his change was made in violation of Section 3 B *supra* of the various collective bargaining agreements (Plan incorporated by reference)" and that "[d]efendants violated the provisions of the Plan, and the collective bargaining agreements, by creating age related categories in an arbitrary and capricious manner that violated the provision of the Plan." Plaintiffs' complaint did not address the fact that at least one of the named plaintiffs retired under a different contract[2] and simply provided that the Plan was incorporated by reference into "various collective bargaining agreements."

At oral argument, plaintiffs indicated that there was a joint stipulation that the CBA and the Plan were the only documents governing the dispute and that references to any prior collective-bargaining agreements were for background purposes only. Accordingly, although Raymond retired under a different collective-bargaining agreement, she and all plaintiffs represented by her were bound by their counsel's stipulation and this Court has limited its analysis to rights established under the CBA and the Plan.

Although initially disputed, by the time of trial, the parties agreed that defendants had a contractual obligation to make SLI available to retirees. Thus, the only issues left to be decided at trial were (1) whether defendants could change the amount of the SLI premiums; (2) whether defendants were required to continue to subsidize plaintiffs' SLI premiums; and (3) whether defendants could change the structure of the SLI premium from a flat-rate structure to an age-rated structure.

The trial court concluded that the "fundamental question here is whether the Defendants are contractu-

---

[2] Raymond retired in 1983, clearly before the enactment of the Plan.

ally obligated to provide interminable SLI to the members of the Plaintiffs' class at a fixed flat rate premium of $2.36 per thousand per month, in the absence of an explicit or tacit agreement." The trial court held that defendants were free to increase the amount of the premium charged for SLI from $2.36 per thousand a month, in light of the evidence that the premiums had increased over time. The trial court also determined that there was no evidence of an agreement to provide subsidies to retirees for the cost of SLI. Finally, the trial court concluded that "[t]he length, wide spread knowledge, and consistency of the practice of providing SLI at a flat rate premium created a reasonable expectation that the practice would continue," making that practice "binding on the parties." The only issue on appeal is the last of these decisions—that defendants are required to provide SLI to plaintiffs at a flat-rate premium in perpetuity and are prohibited from changing to an age-rated-premium structure.

## II. STANDARD OF REVIEW

When reviewing a trial court's decision after a bench trial, we review its findings of fact for clear error and review de novo its conclusions of law. *City of Flint v Chrisdom Props, Ltd*, 283 Mich App 494, 498; 770 NW2d 888 (2009).

We also review de novo a trial court's interpretation of a written contract. *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007). "The initial question whether contract language is ambiguous is a question of law. If the contract language is clear and unambiguous, its meaning is a question of law. Where the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of

fact." *Port Huron Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich 309, 323; 550 NW2d 228 (1996) (citations omitted).

### III. ANALYSIS

Generally, "a mid-term unilateral modification that concerns, not the benefits of active employees, but the benefits of already retired employees" does not constitute an unfair labor practice. *Allied Chem & Alkali Workers of America v Pittsburgh Plate Glass Co*, 404 US 157, 160; 92 S Ct 383; 30 L Ed 2d 341 (1971). This is because retirees "are neither 'employees' nor bargaining unit members." *Id.* at 176. However, "[u]nder established contract principles, vested retirement rights may not be altered without the pensioner's consent." *Id.* at 181 n 20. Therefore, in order for plaintiffs to sustain their claim that defendants could not unilaterally modify their SLI premiums from a flat-rate premium to an age-rated premium, plaintiffs must show that they had a contractual right to a flat-rate premium in perpetuity and that that right was contained in their contracts at the time they retired, so that it could be deemed to be vested. Accordingly, before the question of vesting arises, this Court must determine if such a contractual right exists, whether by express provision or past practice.

### A. EXPRESS CONTRACTUAL RIGHT

The CBA's only explicit reference to SLI is in article 29.16 and provides, "Supplemental life insurance is available under a group plan at the option of the employee." It makes no mention of what the rate is or how it will be calculated and also contains no reference to SLI for retirees. However, article 29 of the CBA also provides, "Except where it is in conflict with the express

terms of this agreement, the *Wayne County Health and Welfare Benefit Plan* ('the Plan') effective December 1, 1990 is hereby incorporated by reference."

Section 3(B) of the Plan provides:

> Supplemental life insurance is available under a group plan at the option of the employee. Supplemental life insurance will soon be age rated at the County's option. Age groupings for rates will be as follows: 29 and under, 30 to 34, 35 to 39, 40 to 44, 45 to 49, 50 to 54, 55 to 59, 60 to 64, 65 to 69, 70 and up. The rate that the employee pays for supplemental life [insurance] will increase as the employee grows older. Employees and retirees will, subject to the terms and conditions of the life insurance company, be eligible to transfer to the age rated group life insurance plan. The amount of the life insurance available for any individual and the life insurance policy provisions shall be determined by the life insurance company.

Because § 3(B) is not in direct conflict with any provision of the CBA, it is incorporated through article 29.

Plaintiffs argue that § 3(B) of the Plan is inconsistent with the CBA because article 44.01 of the CBA provides that all fringe benefits not changed or covered by the contract are to remain in full force and effect.[3] This argument ignores that article 29.16 of the CBA provides the right to SLI. Therefore, SLI is covered by and, with the age-rated language in the Plan, arguably changed by, the contract. Accordingly, article 44.01 is

---

[3] Article 44.01 provides:

It is agreed that all established fringe benefits not changed or covered in this Agreement that are now being received by all the employees in the bargaining unit covered by this Agreement shall remain in full force and effect. The Employer shall not establish any benefit for the employees covered in this Agreement without first negotiating such benefit with the Union.

inapplicable because it only applies to those benefits *not* changed or covered by the CBA.

Because there is an express provision in the CBA that SLI will, at some point, be changing to an age-rated-premium structure and that retirees will be eligible to "transfer" to that plan, we conclude that, under the express language of the CBA as modified through the incorporation of the Plan, there is no express contractual right to a flat-rate-premium structure.

### B. PAST PRACTICE

Because the CBA does not contain an express right to a flat-rate-premium structure, the only way plaintiffs could have a vested right to a flat-rate-premium structure would be based on a past practice amending the contract provisions.

### 1. APPLICABILITY OF THE DOCTRINE

Defendants argue that the past-practice doctrine is inapplicable to retirees. We agree in part, but still find the doctrine applicable in the present case.

"[A] past practice which does not derive from the parties' collective bargaining agreement may become a term or condition of employment which is binding on the parties." *Amalgamated Transit Union v Southeastern Mich Transp Auth*, 437 Mich 441, 454; 473 NW2d 249 (1991). In *Port Huron*, 452 Mich at 325, our Supreme Court held:

> In order to create a term or condition of employment through past practice, the practice must be mutually accepted by both parties. Where the collective bargaining agreement is ambiguous or silent on the subject for which the past practice has developed, there need only be "tacit agreement that the practice would continue." However,

> where the agreement unambiguously covers a term of
> employment that conflicts with a parties' past behavior,
> requiring a higher standard of proof facilitates the primary
> goal of the PERA[4]—to promote collective bargaining to
> reduce labor-management strife. [*Id.* at 325-326 (citations
> omitted).]

As previously noted, however, under *Allied Chem*, 404
US at 160, "a mid-term unilateral modification that
concerns, not the benefits of active employees, but the
benefits of already retired employees" does not consti-
tute an unfair labor practice, and retirees "are neither
'employees' nor bargaining unit members," *id.* at 176.
Taking these holdings together, there is a strong infer-
ence that the past-practice doctrine cannot amend
retirees' contracts.

First, a past practice creates "a term or condition of
employment . . . ." *Port Huron*, 452 Mich at 325; *Amal-
gated*, 437 Mich at 454. However, retirees are, by
definition, no longer employed and cannot be consid-
ered employees. *Allied Chem*, 404 US at 176. Thus, a
change in retiree benefits cannot be deemed a change in
a term or condition of employment. Furthermore, the
standard of proof to permit a past practice to override
the express terms of a collective-bargaining agreement
is based on facilitating "the primary goal of the
PERA—to promote collective bargaining to reduce
labor-management strife." *Port Huron*, 452 Mich at
326. Under *Allied Chem*, retirees are not bargaining-
unit members and, therefore, fall outside the labor-
management relationship. *Allied Chem*, 404 US at 176.
If the purpose of giving deference to contract provisions
over past practice is related to collective-bargaining
goals, the standard, and therefore the doctrine, would

---

[4] Public employees relations act, MCL 423.201 *et seq.*

seem to have little relevance to those people who no longer have any part to play in collective bargaining, namely, retirees.

However, a past practice may have amended a contract before someone's retirement. Accordingly, we find that the doctrine is applicable in this case, although in a limited context. That is, the past-practice doctrine may only be used to establish that a contractual right existed *at the time of retirement.* Absent explicit contractual language to the contrary, a retiree's contractual rights vest, if at all, at the time of retirement. See *Winnett v Caterpillar, Inc,* 553 F3d 1000, 1008-1012 (CA 6, 2009). Thus, the retiree must show that the past practice had already established the right at the time of retirement. Actions taken after a person's retirement that ultimately result in a finding of a past practice would not create a vested contractual right for that person because that person's rights were fixed on the basis of the contract that existed at the time of his or her retirement. Thus, it is too broad to say that past practice never applies to retirees. Rather, a retiree relying on the past-practice doctrine must show that the past practice had modified the contract under which the retiree retired. If any of the actions upon which a retiree relies to assert a past practice occurred after the retiree's date of retirement, the claim must fail.

### 2. EXISTENCE OF A PAST PRACTICE

"Where the collective bargaining agreement is ambiguous or silent on the subject for which the past practice has developed, there need only be 'tacit agreement that the practice would continue.' " *Port Huron,* 452 Mich at 325, quoting *Amalgamated,* 437 Mich at 454-455. However, where a past practice is clearly contrary to clear contract language,

the unambiguous contract language controls unless the past practice is so widely acknowledged and mutually accepted that it amends the contract. The party seeking to supplant the contract language must show the parties had a meeting of the minds with respect to the new terms or conditions so that there was an agreement to modify the contract. [*Port Huron*, 452 Mich at 312.]

Under this standard, we must first determine whether there is a contract provision that provides for how SLI premiums will be calculated and, if so, determine whether that contract provision is directly contrary to the past practice argued by plaintiffs.

As previously noted, the CBA's only explicit reference to SLI provides that "[s]upplemental life insurance is available under a group plan at the option of the employee." It makes no mention of what the rate is or how it will be calculated. However, because the CBA incorporates the Plan, it contains an express provision that SLI will, at some point, be changing to an age-rated-premium system and that retirees will be eligible to "transfer" to that plan. Accordingly, plaintiffs' contention that there is no provision contained in the CBA that relates to how the SLI rate will be calculated is without merit.

In light of the existence of an express provision in the CBA providing how the SLI rate will be calculated, plaintiffs' allegation of a past practice prohibiting a change from a flat-rate-premium structure is contrary to the express contract language, making the *Port Huron* standard the applicable standard in this case. Accordingly, "the unambiguous contract language controls unless the past practice is so widely acknowledged and mutually accepted that it amends the contract." *Id.*

The trial court avoided the *Port Huron* standard of requiring proof that "the parties had a meeting of the

minds with respect to the new terms or conditions so that there was an agreement to modify the contract," *id.*, by finding that the SLI provision contained in the Plan was ambiguous. We disagree with the trial court and hold that the provision is not ambiguous.

The trial court relied heavily on the fact that § 3(B) of the Plan provides that "[t]he rate that the *employee* pays . . . will increase" and that the section fails to mention retirees even though both "[e]mployees *and retirees*" are referenced with respect to the transfer provision. (Emphasis added.) However, after considering the use of the term "employee" throughout the Plan and the CBA as it relates to SLI, we disagree with the trial court's interpretation.

The CBA and the Plan *both* only provide that SLI "is available under a group plan at the option of the *employee.*" (Emphasis added.) Because SLI is expressly terminated on the first day of retirement under § 6 of the Plan,[5] and nothing within the CBA provides to the contrary, indeed the CBA makes no provision for SLI for retirees at all, unless the term "employee" also includes "retirees" in the SLI provisions in the Plan, there is no provision anywhere that requires the county to provide SLI to retirees. Therefore, the only way to read the CBA and the Plan provisions to hold that retirees are entitled to SLI requires interpreting the SLI provisions related to "employees" as including "retirees." Without such an understanding, there would seem to be no question that the county could unilaterally change how the premiums were calculated; indeed it could have

---

[5] Section 6 of the Plan, "Insurance Programs: Termination Date," provides that "[s]ubject to various provisions of labor agreements such as . . . eligibility for retiree health and life insurance benefits, the following health benefit programs shall terminate on the last day of the month following a . . . retirement" and includes both life insurance and SLI as benefits that are terminated.

unilaterally decided to stop providing SLI to retirees entirely, because there is no contractual requirement that it provide SLI to "retirees"—only "employees."

Similarly, the previous collective-bargaining agreements provided by plaintiffs, such as the 1981 to 1984 collective-bargaining agreement under which Raymond retired, also provide no express language for SLI for retirees. For example, article XXVI, "Insurance," § 1, "Life Insurance Program," subsection (C) of the 1981 to 1984 agreement provides: "The EMPLOYER shall make available the facility of payroll deduction for a (contributory) Supplemental Life Insurance Plan which premiums shall be paid entirely by the participating employees." Although the chart for the contributory plan provides a list of benefits and costs for "Active Employees age 65 and over and employees who retire on or after 11-1-64," no actual contract clause provides for SLI to be provided to retirees. The closest any provision comes is that, for those employees who elect "The New Plan," upon retirement, "the New Plan terminates. Everyone who is under the New Plan is also under the Old Plan (active employees age 65 and over and employees who retired on or after November 1, 1964)." Thus, reference is made that "the Old Plan" provides rates for retirees, but no actual provision specifically provides that retirees will be provided SLI at all. Accordingly, even the previous collective-bargaining agreements seem to rely on retirees' inclusion within the provision that SLI be provided to "employees." Once "retirees" are read into the Plan's SLI provisions, it becomes clear that they are subject to the age-rated-premium system that will be implemented "at the County's option."

The trial court also found ambiguity in the fact that the provision does not indicate when the change to an age-rated-premium system will take place. We find no

ambiguity, because the clause explicitly provides when the change will occur—it will occur "at the County's option."

Although the trial court determined that there was no evidence to indicate that SLI rates were ever the subject of collective bargaining and noted that the Plan provisions are not subject to the approval of the union, it recognized that "if the union does not agree with a provision of the Plan an attempt to change it may be made through the collective bargaining process." This finding was consistent with the testimony of Richard Johnson, staff representative at Michigan AFSCME Council 25, who testified that "if there's something in the Plan that the union could not agree to then we identify that or, or clarify it in the Collective Bargaining Agreement."

The record also contains evidence that the union exercised its right to bargain for changes to the Plan, because there are specific provisions related to insurance that alter the terms of the Plan. For example, although § 3(A) of the Plan only provides for $15,000 of employer-paid group life insurance, article 29.16 of the CBA provides that the amount is $20,000. The fact that the union did not bargain for any changes to § 3(B) of the Plan indicates its acceptance. Therefore, we conclude that the union did have notice of this provision, could have bargained to change it and, having not done so, is bound by it unless it can meet the burden of proof for a past practice to the contrary set forth in *Port Huron*.

Under *Port Huron*, 452 Mich at 312, plaintiffs' assertion that a flat-rate premium for SLI was a binding past practice required a showing that plaintiffs and the county "had a meeting of the minds with respect to" the flat-rate premium's existing in perpetuity "so that

there was an agreement to modify the contract." *Id.* Plaintiffs were required to "submit proofs illustrating that the parties had a meeting of the minds with respect to the new terms or conditions—intentionally choosing to reject the negotiated contract and knowingly act in accordance with the past practice." *Id.* at 329.

Although plaintiffs testified that *they* believed that such an agreement existed, they provided no evidence that *defendants* shared their belief. Indeed, the evidence supports that there was never a meeting of the minds on this issue.

Raymond testified that she was informed that she could purchase supplemental life insurance and that she "would have to pay 8 dollars and something or like 9 dollars a month." Exhibit 2 to her deposition was a letter that stated at the top, "Please do NOT destroy this form letter. Consult it before you call the Retirement Office." Paragraph 9 of the letter provides:

> The free $10,000 life insurance is reduced to $4,000 (Road Commission is reduced to $7,000). The most you can carry in Supplemental Life Insurance is $11,500 @ $8.74 per month. The premium is deducted from your monthly pension check.

Nothing in this letter indicates how the rate was calculated or how future rates would be calculated.

Butler testified that at her meeting with the retirement representative she did not discuss SLI coverage and was not told what the premium for SLI would be. Plaintiffs rely on the document provided to Butler upon her retirement, which provides:

> LIFE INSURANCE (*All Plans*)
>
> The basic life insurance you carried as an active employee will be reduced to $5,000, depending on your coverage group. Supplemental life insurance can be <u>continued</u> at

a maximum of $11,500 by monthly payroll deduction, if applicable. You will not receive a policy, but a statement of coverage and beneficiaries can be obtained upon request.

Butler testified that she had no discussions regarding what the rate for SLI coverage would be, but that she "continued it, because I was under the impression that it was the same [as when she was an active employee]." However, she admitted that no one ever told her that the amount of the premium would not change, but she had simply assumed that the amount would remain the same because it was a benefit continued from when she was working. Furthermore, when counsel was attempting to clarify Butler's testimony regarding how rates had changed since she retired, she testified, "I don't know about a flat rate. I don't know anything about a flat rate."

Nothing in this evidence supports a conclusion that defendants intentionally chose to reject the express terms of the CBA that permitted them to implement an age-rated-premium structure at the county's option.

Plaintiffs' argument that a past practice was created because defendants waited 16 years to implement the age-rated-premium structure is also unavailing in light of the express language in the Plan. Defendants' failure to implement the change to an age-rated-premium structure as permitted by the Plan did not prevent them from doing so in the future. See *Amalgamated*, 437 Mich at 458 n 15 (noting that the Michigan Employment Relations Commission had previously "opined that merely refraining from action does not establish a 'past practice' precluding future action"). Further, "[s]imply because a party 'knew or should have known' it was acting contrary to the agreement is insufficient to overcome express language of the agreement." *Port Huron*, 452 Mich at 332. Thus, because the

Plan and, therefore, the CBA expressly permitted defendants, at their option, to implement an age-rated-premium structure, the fact that defendants inserted the language in 1991 but did not implement the change until 2007 did not, by itself, constitute a past practice that would amend the CBA.

Having shown no agreement that SLI premiums would forever remain at a flat rate and no actions by defendants that they intended to modify the CBA to supplant the express language in the Plan, plaintiffs failed to meet their burden. *Id.* at 312. Accordingly, the trial court erred when it concluded that there was a past practice that amended the CBA to provide a contractual right to a perpetual flat-rate-premium structure.

Furthermore, even if we were to evaluate this case under the reduced "tacit agreement" standard from *Amalgamated*, 437 Mich at 454-455, we would reach the same result.

Plaintiffs argued in closing before the trial court that a "past-practice case arises to fill a void in the agreement, and clearly there was a void in this agreement. How would you know what the cost of the insurance was unless the parties mutually, through tacit agreement established it." This argument actually benefits defendants. That is, retirees have always paid the rates set by the insurers. Thus, the past practice was that the insurers set the rates and, if retirees wanted to continue to receive the SLI, each retiree would be responsible for paying 100 percent of whatever rate the insurance companies set. Thus, if there is any past practice at all, it is that retirees simply pay the rates set by the insurers.

The evidence shows that rates were unilaterally set by the insurer and, although defendants might have negotiated rates to some degree, or shopped for differ-

ent rates from other insurers, defendants ultimately only had the power to accept or reject the rates provided by the insurers. As defendants noted in their closing arguments, "The practice testified to by [various witnesses] was that the premiums would be negotiated between the County and the carriers. They arrived at a premium and that premium would be incorporated." Our review of the record supports this conclusion.

Edward Maitland, owner of an insurance company that "worked with Wayne County on the retiree life contract through, with Prudential," indicated that he, as an insurance broker, presented age-banded premium rates to the county as a way to address the shortfall between what the insurance was costing the county and what the retirees were paying for the insurance. He believed that he provided the rates to Yee and Underwood. Underwood testified that "it was a determination made by Prudential that the $2.36 rate, flat rate was inadequate, that the County should have had an age-banded rate." Lyn Roberts, a division director employed by the Wayne County employees retirement system, testified that "[t]he County did not change the rates, . . . [t]he rates were changed."

Salvatore Saputo, former director of risk management for Wayne County, testified that it was his "responsibility to negotiate with the insurance carriers as to the renewal rates and, and then to transmit the new rates on to Retirement who had responsibility to do the billings and to process the payroll deductions." The negotiations occurred annually, at which time the insurers would submit proposals for rates for SLI. If the county was unhappy with the rates provided, it would attempt to negotiate and obtain alternative proposals to make the rates lower, but once a proposal was accepted, the proposal was transmitted to the retirement office so

it could take care of billing for the premiums. Thus, once the county and the carrier agreed on the rates, the rate sheets were transmitted to the retirement office and implemented for billing purposes, without further input.

Consistent with this testimony, Yee testified that he was a steward and ultimately a committee person for AFSCME Council 25, Local 1659, and that he attended bargaining sessions in the early 1980s representing Local 1659. He testified that he understood SLI to be "a voluntary life insurance program, so if you were in it you paid for it, regardless. I mean, whatever it was you paid for it." Yee further testified that when Prudential took over the insurance, it mentioned that there would be a problem continuing to charge a flat-rate premium because the premiums being collected would not pay for the benefit being provided. All this testimony supports the conclusion that it was the insurer who determined how rates were calculated and provided those rates to the county. Once the rates were implemented, retirees who wished to continue to receive the benefit would need to pay 100 percent of whatever the new rates were.

The evidence is clear that the premium rates were set by the insurance company and that the rates could and did change. Furthermore, there is no evidence that *anyone* was ever promised that the method for calculating premiums (flat-rate as opposed to age-rated) would remain the same. Plaintiffs' brief also points to language in the summary plan description for coverage under the employee term life insurance policy, which stated that coverage only ends when "you fail to pay, when due, any contribution required." However, as before, this language does not indicate what contribution is required or how it will be calculated. Indeed, it supports the position that the insurance companies

determine how premiums are calculated and that defendants' obligation is to simply provide plaintiffs with the opportunity to purchase the insurance at whatever premium rates the insurers set.

Accordingly, we find that the record shows no evidence of a tacit agreement between plaintiffs and defendants that the SLI premiums would retain a flat-rate-premium structure in perpetuity. Indeed, we hold that if any past practice was shown to exist by tacit agreement, it was that the insurers set the rates for SLI and determined how they were calculated, those rates were provided to the county, and once the county accepted the rates, retirees who wished to maintain the SLI benefit were required to pay 100 percent of whatever rates were accepted by the county. Under such circumstances, defendants' implementation of the new age-based SLI premium structure would have been consistent with that past practice and, therefore, entirely permissible.

However, because we believe that *Port Huron*, rather than *Amalgamated*, provides the appropriate standard for this case, we hold that plaintiffs failed to establish a past practice that amended the clear language of the CBA that an age-rated-premium structure would be implemented "at the County's option," and that the trial court erred as a result of its conclusions to the contrary.

## IV. CONCLUSION

Because plaintiffs failed to meet their burden to prove a past practice, there was no express contractual right or a past practice that amended the CBA to provide a right to a flat-rate SLI premium structure in perpetuity and, therefore, nothing that could have vested. Absent a vested right, defendants could unilat-

erally modify the SLI premium rate structure without plaintiffs' consent.[6] See *Allied Chem*, 404 US at 181 n 20. Accordingly, we reverse the trial court's determination that plaintiffs are entitled to a flat-rate-premium structure on the basis of a vested contract right and remand for entry of an order consistent with this opinion. We do not retain jurisdiction.

[6] In light of our conclusion that reversal is required because of plaintiffs' failure to prove a past practice, it is unnecessary to address the applicability of the reservation-of-rights language in the Plan.